794 So.2d 696 (2001)
STATE of Florida, BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND, Appellant,
v.
DAY CRUISE ASSOCIATION, INC., Appellee.
No. 1D00-1058.
District Court of Appeal of Florida, First District.
September 13, 2001.
*697 Teri L. Donaldson, General Counsel; John W. Costigan, Deputy General Counsel, Maureen M. Malvern, Assistant General Counsel, and Andrew J. Baumann, Assistant General Counsel, Department of Environmental Protection, Tallahassee, for Appellant.
Stephen H. Grimes and Susan L. Kelsey, Holland & Knight, LLP, Tallahassee, for Appellee.
BENTON, J.
This case asks the question whether an administrative rule the Board of Trustees of the Internal Improvement Trust Fund (Trustees) proposed for adoption would "exceed[ ] its grant of rulemaking authority" or "enlarge[ ], modif[y], or contravene[ ] the specific provisions of law implemented." § 120.52(8)(b) & (c), Fla. Stat. (1999). Day Cruise Association, Inc. (Day Cruise) raised the question in a rule challenge brought under section 120.56(2), Florida Statutes (1999). Concluding that the proposed rule was beyond the authority the Legislature had delegated to the Trustees, the administrative law judge (ALJ) entered a final summary order granting Day Cruise's petition for administrative determination of invalidity of proposed rule. We affirm invalidation of the proposed rule.
The Trustees proposed to adopt a rule that would forbid the use of sovereignty submerged lands for mooring or anchoring cruise ships bound offshore primarily so their passengers could gamble (legally) on the high seas, as well as for mooring or anchoring vessels used to ferry passengers to or from such cruise ships. This wording was proposed:
The use of sovereign submerged lands for the anchoring or mooring of vessels used primarily for the purposes of gambling shall be prohibited when such vessels are engaged in "cruises to nowhere," where the vessels leave and return to the State of Florida without an intervening stop within another state or foreign country, or waters within the jurisdiction of another state or foreign country. This prohibition also applies to any vessel used to carry passengers to, or from, "cruises to nowhere."
Proposed Rule 18-21.004(1)(i). The Trustees' notice of rule development cited section 253.03(7), Florida Statutes (1999), as rulemaking authority, and listed sections 253.001, .03, .04, and .77, Florida Statutes (1999), along with Article X, section 11, Florida Constitution, as the "statutes" the proposed rule would implement.

I.
To the extent the Trustees' exercise of authority may be dichotomized into proprietary and regulatory functions, the proposed exercise of authority in the present case falls on the regulatory side of the divide. The question is whether cruise ships and their tenders can moor or dock at facilities at which the Trustees have authorized physically comparable craft to moor or dock. At issue is a selective prohibition based not on the use vessels make of sovereignty lands but on the use *698 to which certain vessels are put once they have steamed offshore.
In any event, the performance even of unambiguously proprietary duties does not exempt the Trustees from rulemaking restrictions the Administrative Procedure Act (APA) imposes. See State, Bd. of Trustees of the Internal Improvement Trust Fund v. Lost Tree Village Corp., 600 So.2d 1240, 1243 (Fla. 1st DCA 1992). As the state agency holding title to and charged with managing the state's sovereignty lands, the Trustees have broad responsibilities under the public trust doctrine. See id. ("Although the Board, acting in its proprietary capacity as owner of sovereign submerged lands, `is different from other state agencies acting in a regulatory capacity,' the policies underlying the public trust doctrine do not of themselves exempt the Board from the operation of the APA." (citation omitted)); see also Mariner Properties Dev. v. Board of Trustees of the Internal Improvement Trust Fund, 743 So.2d 1121, 1122-23 (Fla. 1st DCA 1999); Lost Tree Village Corp. v. Board of Trustees of the Internal Improvement Trust Fund, 698 So.2d 634, 635-36 (Fla. 4th DCA 1997); Board of Trustees of the Internal Improvement Trust Fund v. Barnett, 533 So.2d 1202, 1206 (Fla. 3d DCA 1988) (discussing an asserted distinction between the proprietary function of granting consent for construction of a private dock on sovereignty submerged lands, and the regulatory function of attempting to revoke consent, which required compliance with the APA); Graham v. Edwards, 472 So.2d 803, 806-07 (Fla. 3d DCA 1985) (holding Trustees' proprietary interest implicated in riparian landowner's efforts to build a private dock on sovereignty submerged land). We must decide whether the Trustees' proposed rule passes muster under the revised APA.

II.
Recent amendments to the APA have tightened and clarified rulemaking restrictions. In 1996, the Legislature enacted the following:[1]
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement, interpret, or make specific the particular powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than the particular powers and duties conferred by the same statute.
Ch. 96-159, § 3, at 152, Laws of Fla. (codified at § 120.52(8), Fla. Stat. (Supp.1996)). The precise effect of this then new statutory language was at least originally a matter of some debate.[2]
*699 We considered the import of the 1996 amendments in St. Johns River Water Mgmt. Dist. v. Consolidated-Tomoka Land Co., 717 So.2d 72, 80 (Fla. 1st DCA 1998) (interpreting "particular" as requiring only that a (proposed) rule be "within the range of powers" statutorily granted to the agency, and deeming (proposed) rules valid if "within the class of powers and duties identified in the statute to be implemented"), rev. denied, 727 So.2d 904 (Fla. 1999). But see Dep't of Bus. & Prof'l Regulation v. Calder Race Course, Inc., 724 So.2d 100, 102 (Fla. 1st DCA 1998) (applying the 1996 amendments in invalidating as beyond the scope of the enabling statute an agency rule that would have allowed warrantless searches at a parimutuel facility); St. Petersburg Kennel Club v. Dep't of Bus. and Prof'l. Regulation, 719 So.2d 1210, 1211 (Fla. 2d DCA 1998) (applying the 1996 amendments in invalidating rules defining poker because the enabling statute did not specifically authorize them).

III.
In apparent response to the decision in Consolidated-Tomoka, the Legislature again amended sections 120.52(8) and 120.536(1) in 1999, stating its intent "to clarify the limited authority of agencies to adopt rules in accordance with chapter 96-159, Laws of Florida, and ... to reject the class of powers and duties analysis." Ch. 99 379, § 1, at 3789, Laws of Fla. The legislative history of the 1999 amendments reflects a legislative intent that the standard for agency rulemaking be more restrictive than the standard explicated in what the Legislature deemed inappropriately broad judicial interpretations of the 1996 amendments to the APA, expressly including Consolidated-Tomoka:
[The bill] rejects a judicial interpretation of this standard which created a functional test to determine whether a challenged agency rule is directly within the class of powers and duties identified in the statute to be implemented. [specifically citing Consolidated-Tomoka ]
Fla. H.R. Comm. on Govtl. Rules & Regs., CS/HB 107 (1999) (ch. 99-379, Laws of Fla.) Final Staff Analysis 5 (June 30, 1999); see also Kent Wetherell, Sour Grapes Make Sweet Wine, Fla. Bar Environ. and Land Use Law Section, Section Reporter, (Dec.1999) ("Consolidated-Tomoka... did not survive the legislative session following its rendition as it was effectively overruled[3] by legislation adopted in the 1999 Session.... The 1999 legislation explicitly rejects the `class of powers and duties' test created by the court in Consolidated-Tomoka...."). "[T]he Legislature has rejected the standard we adopted in Consolidated-Tomoka." Southwest Florida Water Mgmt. Dist. v. Save the Manatee Club, Inc., 773 So.2d 594, 599 (Fla. 1st DCA 2000).
Implementing this legislative intent to cabin agency rulemaking authority, the *700 1999 Legislature amended the "flush left" paragraph of section 120.52(8) and parallel language in section 120.536(1), by replacing the phrase "particular powers and duties" with the phrase "specific powers and duties," and by expressly rejecting the judicial "class of powers and duties" gloss:
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or, interpret the, or make specific the particular powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency's class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific the particular powers and duties conferred by the same statute.
Ch. 99-379, § 2, at 3790, § 3, at 3791, Laws of Fla. (codified respectively at §§ 120.52(8), 120.536(1), Fla. Stat. (1999)). Under the 1996 and 1999 amendments to the APA, it is now clear,[4] agencies have rulemaking authority only where the Legislature has enacted a specific statute, and authorized the agency to implement it, and then only if the (proposed) rule implements or interprets specific powers or duties, as opposed to improvising in an area that can be said to fall only generally within some class of powers or duties the Legislature has conferred on the agency.
Most "[a]dministrative agencies are creatures of statute and have only such powers as statutes confer. State ex rel. Greenb[e]rg v. Florida State Bd. of Dentistry, 297 So.2d 628, 634 (Fla. 1st DCA 1974)." Fiat Motors of N. Am. v. Calvin, 356 So.2d 908, 909 (Fla. 1st DCA 1978). The statutory provisions governing rulemaking must be interpreted in light of the Legislature's stated intent to clarify significant restrictions on agencies' exercise of rulemaking authority,[5] and to reject the *701 "class of powers and duties" analysis employed in Consolidated-Tomoka. If reasonable doubt exists as to the "lawful existence of a particular power that is being exercised, the further exercise of the power should be arrested." Radio Tel. Communications, Inc. v. Southeastern Tel. Co., 170 So.2d 577, 582 (Fla.1964).

IV.
In invalidating the proposed rule at Day Cruise's behest, the ALJ decided both that the trustees had exceeded their rulemaking authority, in violation of section 120.52(8)(b), Florida Statutes (1999), and that they had enlarged the specific provisions of law purportedly implemented, in violation of section 120.52(8)(c), Florida Statutes (1999). Although interrelated, two different issues are involved. Our standard of review for each issue is de novo. See § 120.68(7), Fla. Stat. (1999). If correct, either as to section 120.52(8)(b) or as to section 120.52(8)(c), the ALJ's ruling must be affirmed.

A.
The Trustees' notice of proposed rulemaking identified subparagraphs 253.03(7)(a) and (b), Florida Statutes, as statutory authority for promulgating a rule to preclude the use of sovereign submerged lands for mooring gambling vessels or boats transporting passengers to or from gambling vessels. See § 120.54(3)(a)1., Fla. Stat. (1999).

1.
Subparagraph (7)(a) describes the Trustees' duties in very general terms and confers equally general rulemaking authority:
The Board of Trustees of the Internal Improvement Trust Fund is hereby authorized and directed to administer all state-owned lands and shall be responsible for the creation of an overall and comprehensive plan of development concerning the acquisition, management, and disposition of state-owned lands so as to ensure maximum benefit and use. The Board of Trustees of the Internal Improvement Trust Fund has authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this act.
§ 253.03(7)(a), Fla. Stat. (1999). Subparagraph (7)(a) confers no rulemaking authority specific to submerged lands. Unlike subparagraph (7)(b), subparagraph (7)(a) makes no mention of submerged lands whatsoever.
As comprehensive as its grant of rulemaking authority is, subparagraph (7)(a) should not be read as setting at naught the restrictions on rulemaking authority set out in subparagraph (7)(b), which applies specifically to sovereignty submerged lands. See Ellis v. State, 622 So.2d 991, 1001 (Fla.1993) ("It is a fundamental rule of construction that statutory language cannot be construed so as to render it potentially meaningless...."). The more specific provisions of subparagraph (7)(b) should be given effect. Gretz v. Florida Unemployment Appeals Comm'n, 572 So.2d 1384, 1386 (Fla.1991) ("the more specific statute controls"); Adams v. Culver, 111 So.2d 665, 667 (Fla.1959) ("It is well settled ... that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms."); Seven Seas Frozen Products v. Fast Frozen Foods, 43 So.2d 181, 182 (Fla. 1949) (same).

2.
While subparagraph (7)(b) does confer rulemaking authority with respect to submerged *702 lands, it does not authorize adopting the proposed rule, because it qualifies the grant of rulemaking authority in ways that are incompatible with adoption of the proposed rule.
With respect to administering, controlling, and managing sovereignty submerged lands, the Board of Trustees of the Internal Improvement Trust Fund also may adopt rules governing all uses of sovereignty submerged lands by vessels, floating homes, or any other watercraft, which shall be limited to regulations for anchoring, mooring, or otherwise attaching to the bottom; the establishment of anchorages; and the discharge of sewage, pumpout requirements, and facilities associated with anchorages. The regulations must not interfere with commerce or the transitory operation of vessels through navigable water, but shall control the use of sovereignty submerged lands as a place of business or residence.
§ 253.03(7)(b), Fla. Stat. (1999) (emphasis supplied). This provision limits the Trustees' submerged lands rulemaking authority to rules governing physical changes to or other effects on sovereignty lands and proximate waters and provides that any such rules the Trustees may adopt "must not interfere with commerce or the transitory operation of vessels through navigable water." § 253.03(7)(b), Fla. Stat. (1999).
Nothing authorizes the Trustees to promulgate a rule prohibiting the use of sovereignty submerged lands on account of lawful activities on board ships at sea which have no physical or environmental effect on sovereignty submerged lands or adjacent waters. Although framed as a regulation of anchoring or mooring, the proposed rule does not regulate the mode or manner of mooring. It does not govern the use of the bottom in any way that protects its physical integrity or fosters marine life. Instead it deliberately and dramatically interferes with certain kinds of commerce solely on account of activities that occur many leagues from any dock.
The Legislature specifically limited the Trustees' rulemaking authority as to subject matter by specifying that their "regulations must not interfere with commerce or the transitory operation of vessels through navigable water ...." § 253.03(7)(b), Fla. Stat. (1999). The proposed rule transgresses this specific limitation on rulemaking authority because it would interfere with lawful businesses and the operation not only of cruise-to-nowhere vessels but also of launches ferrying passengers to and from such vessels through navigable water.

B.
The Trustees were also required to include in their notice of proposed rule "a reference to the section or subsection of the Florida Statutes or the Laws of Florida being implemented, interpreted, or made specific." § 120.54, (3)(a)1., Fla. Stat. (1999).
The first sentence of 120.536(1) states that "[a] grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required." This language is apparently intended to stress that under Florida's APA, a rule is not within delegated authority solely because the agency has a valid grant of rulemaking power. Under the statutory scheme, a grant of power to adopt rules is certainly required, but normally should be of little interest. Almost all agencies have a general grantusually found in the first part of their enabling statutewhich basically states that the agency "may adopt rules necessary to carry out the provisions of this chapter." *703 The first sentence [of section 120.536] emphasizes that such a general grant is sufficient to allow an agency to adopt a rule only when relied upon in conjunction with a specific provision of law to be implemented....
F. Scott Boyd, Legislative Checks on Rulemaking Under Florida's New APA, 24 Fla. St. U.L.Rev. 309, 339 (1997) (footnotes omitted). The Trustees assert that the proposed rule implements article X, section 11, Florida Constitution, and sections 253.03 and 253.04, Florida Statutes (1999).
None of the cited constitutional or statutory provisions makes reference to, much less gives specific instructions on treatment of, the "day cruise industry" or contains any other specific directive that would provide the support for the proposed rule that the APA now requires. The constitutional provision[6] the Trustees cite is cast in broad, general language appropriate to its broad, general purposes:
Sovereignty lands.The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.
Art. X, § 11, Fla. Const. Almost equally general, section 253.03, Florida Statutes (1999) provides in pertinent part:
(1) The Board of Trustees of the Internal Improvement Trust Fund of the state is vested and charged with the acquisition, administration, management, control, supervision, conservation, protection, and disposition of all lands owned by, or which may hereafter inure to, the state or any of its agencies, departments, boards, or commissions.
Like the constitutional provision, the statutory provision describes the Trustees' functions and goals in broad terms. No provision listed[7] as being implemented by *704 the proposed rule purports to authorize much less specifically to directthe Trustees to prohibit only certain vessels from mooring on the basis of lawful activities on board (possibly other) vessels once they are on the high seas. This contrasts starkly with a subsequently enacted special law authorizing the Trustees to lease an historic pier to the City of Daytona Beach on condition that the City "prohibit the operation or entry onto the leased premises of gambling cruise ships, or vessels that are used principally for the purpose of gambling, when these vessels are engaged in `cruises to nowhere.' ..." Ch.2001 316, § 9, Laws of Fla.
Under section 120.52(8)(c), the test is whether a (proposed) rule gives effect to a "specific law to be implemented," and whether the (proposed) rule implements or interprets "specific powers and duties." § 120.52(8), Fla. Stat. (1999). The provisions purportedly to be implemented here are completely silent about day cruises and about gambling, and confer no authority to bar day cruise vesselsor any other vessels from sovereignty submerged lands based on lawful activities occurring outside Florida's territorial jurisdiction.
In the absence of a specific power or duty enabling or requiring the Trustees to regulate cruises to nowhere[8] or to regulate gambling or to regulate on the basis of activities occurring aboard vessels after they leave sovereignty submerged lands and adjacent waters, the Trustees' proposed rule exceeds the Trustees' rulemaking authority and is an invalid exercise of delegated legislative authority as defined in section 120.52(8)(c).

V.
Because the proposed rule exceeds limitations on the Trustees' rulemaking authority making it an invalid exercise of delegated legislative authority as defined in section 120.52(8)(b)and because it would not implement specific enabling legislation (or any specific constitutional power or duty) as contemplated by section 120.52(8)(c), the final summary order is affirmed.
BROWNING, J., JOINS OPINION AND CONCURS BY SEPARATE OPINION; ALLEN, C.J., DISSENTS.
BROWNING, J. concurring.
I concur with Judge Benton's well-reasoned opinion. However, my analysis and determination are based upon a more direct and simple view that compels me to write.
*705 In my judgment the applicable principles of law, and appropriate analysis necessary for a determination of this case, are succinctly stated by Judge Padovano in Southwest Florida Water Management District v. Save the Manatee Club, Inc., 773 So.2d 594 (Fla. 1st DCA 2000). I do not believe my commenting on such principles and analysis would serve a useful purpose, but I refer the reader to Save the Manatee Club, Inc.
We are required here to determine three issues: (1) does the Legislature by enacting § 253.03(7)(b) delegate to the Trustees the authority to prohibit Day Cruise's anchorage over sovereignty submerged lands because of its business, or delegate the less intrusive authority to prescribe regulations for Day Cruise's and similar ships' privilege to anchor over sovereignty submerged lands; (2) does the proposed rule impermissibly "interfere with commerce" as prohibited by § 253.03(7)(b); and (3) is Day Cruise's place of business located over sovereignty submerged lands? I conclude from the ordinary meaning of the words of § 253.03(7)(b) that these issues must be resolved in a manner that compels affirmance of the ALJ's order that the proposed rule is invalid.
As the proposed rule effects a prohibition of Day Cruise's right of anchoring over sovereignty submerged lands because of its business, is such prohibition legally sustainable under § 253.03(7)(b)? I conclude the answer is "No." The Trustees' authority under § 253.03(7)(b) is limited to enacting "Regulations" for anchoring, etc. "Regulation" is defined in Webster's New Collegiate Dictionary 966 (1981) as "an authoritative rule dealing with details or procedure." This definition implies to me that prohibition is not a power encompassed within the meaning of the word "regulation." Case law also supports this conclusion. Malone v. City of Quincy, 66 Fla. 52, 62 So. 922 (1913) (right of city to regulate a utility does not include right to prohibit the utility in a certain area); Inglis v. Rymer, 113 Fla. 732, 152 So. 4 (1934) (right to "regulate" skating rinks within city did not empower city to prohibit them absent a nuisance); Yellow Cab Company of Boca Raton, Inc., v. Broward County, 282 So.2d 1 (Fla. 4th DCA 1973) (county had power to impose regulations but not prohibit Yellow Cab taxi in franchise area). Accordingly, in my judgment, the Legislature, when delegating the power to enact "regulations" in § 253.03(7)(b), did not vest the Trustees with the "specific" power to prohibit Day Cruise's use of sovereignty submerged lands as required under § 120.52(8). The opposite result can be achieved only if the Legislature proscribed "prohibition" in conjunction with "regulations" under § 253.03(7)(b).
Not only do the semantics of the grant of authority to the Trustees preponderate against the proposed rule's validity, the restriction that any Trustees' regulation "must not interfere with commerce" clearly bars the proposed rule's enactment. Undebatable is the fact that Day Cruise is engaged in "commerce" and the proposed rule not only will interfere with, but prohibit its commerce. The language of § 253.03(7)(b) is subject to interpretation as to how pervasive a regulation adopted under § 253.03(7)(b) can be before it impermissibly interferes with commerce, but that is not the question before this court. It is a question of whether prohibition of Day Cruise's business is permissible based upon the Trustees' disfavor of a particular business activitygambling. I conclude the Trustees cannot. Such a course is a Legislative prerogative, and not the Trustees', in the absence of a specific grant of such authority to the Trustees. Here that grant was not made under § 257.03(7)(b), but to the contrary is specifically renounced *706 by the words of limitation that the Trustees not "interfere with commerce."
I realize the foregoing construction of "interfere with commerce" may conjure up visions of abuse that impel a remedy that cannot be addressed by the Trustees. However, it must be remembered that other regulatory measures under § 253.03(7)(b) falling short of prohibition based upon business type will be subject to the principle that statutes are construed to avoid an unreasonable consequence. Realty Bond & Share Co. v. Englar, 104 Fla. 329, 143 So. 152 (1932). Furthermore, whether future rules interfere with commerce in other circumstances is ultimately the Legislature's responsibility if recognized ills cannot be addressed by the Trustees under § 253.03(7)(b). In any case, the issue is one for the Legislature, not the Trustees under the cloak of unspecific statutory authority.
Last, the language of § 257.07(7)(b) granting to the Trustees the authority to "control the use of sovereignty submerged lands as a place of business" does not sustain the validity of the proposed rule. Sovereignty submerged lands do not act as Day Cruise's place of business. No gambling transactions take place over sovereignty submerged lands. Day Cruise allows its on-board gambling in international waters where gambling is perfectly legal. If Day Cruise institutes gambling over sovereignty submerged lands, then a place of business is established and the Trustees may act under § 253.03(7)(b) beyond doubt. However, that is not the case here, and for the Trustees to attempt to prohibit Day Cruise's anchoring over sovereignty submerged lands because such location acts as its place of business is clearly impermissible under § 253.03(7)(b) as restricted by § 120.52(8).
In summary, I concluded, just as the ALJ did, the proposed rule is invalid under the dictates of Manatee. If Day Cruise is to be put out of business, the Legislature must do it directly, or amend § 253.03(7)(b) to grant that specific power to the Trustees as required by § 120.52(8). The ALJ should be affirmed for the reasons stated and those stated by Judge Benton.
ALLEN, C.J., dissenting.
I am unable to concur with the majority view and must dissent. The proposed rule in this case appears to me to be clearly within the specific regulatory power granted the Trustees by section 253.03(7)(b), with regard to the use of sovereignty submerged lands for the anchoring or mooring of vessels.
Although the majority complain that the statute does not refer to the "day cruise" industry or gambling boats, the statutory reference to "vessels, floating homes, or any other watercraft" obviously encompasses the vessels being used for these gambling cruises. A more particular delineation of the vessels subject to anchoring or mooring regulation is not required by the "specific powers and duties" provisions in section 120.52(8). As this court explained in Save The Manatee Club, section 120.52(8) does not necessitate a fully detailed catalogue of the possible agency action, and instead expressly allows an agency to implement or interpret the specific powers and duties granted with a more detailed rule. Here, the specific power provided by section 253.03(7)(b) includes the adoption of rules and regulations pertaining to the anchoring or mooring of vessels on sovereignty submerged lands. The absence of any statutory reference to gambling cruises does not restrict this regulatory power, just as the absence of any reference to barges, oil tankers, pleasure boats, or fishing trawlers does not restrict the Trustees' regulatory power as to the anchoring or mooring of those vessels.
*707 The majority's further suggestion that the Trustees' rulemaking authority under section 253.03(7)(b) should be limited to environmental concerns is likewise unwarranted. The statute does not refer to such concerns for regulations pertaining to anchoring or mooring. Rather, it would seem that the majority are merely offering their own personal view as to the matters which the Trustees should consider. But this limitation may not be fairly drawn from the statutory text.
The majority also fail to accord proper meaning to the section 253.03(7)(b) provision that the "regulations must not interfere with commerce or the transitory operation of vessels through navigable water...." Regulations which restrict the anchoring or mooring of certain vessels will necessarily impact the operation and commerce of those vessels, but a prohibition against anchoring or mooring gambling vessels on sovereignty submerged lands does not govern the activities which may be undertaken by or on those vessels while traveling through navigable water. Indeed, the statutory provision against interference with such activities through navigable water concludes with a caveat that the regulations "shall control the use of sovereignty submerged lands as a place of business...." The proposed rule here is consistent with these provisions, as it controls only the use of the sovereignty submerged lands.
The position which the majority adopt in this case largely negates the Trustees' regulatory authority under section 253.03(7)(b), with regard to commercial vessels. The Trustees here are not being allowed to control those vessels' use of sovereignty submerged lands as a place of business, or to weigh policy concerns which impact such use in connection with anchoring or mooring. Indeed, the majority's reasoning might even bar a prohibition against the anchoring or mooring of large commercial vessels at popular locations such as public beaches, despite the obvious threat to public safety. This unlikely image of barges, tugboats, and any other manner of vessels having unrestricted use of such public areas cannot have been within the legislature's contemplation under section 253.03(7)(b). The concurring opinion thus offers the possibility that some interference with commerce could perhaps be permissible, but also casts a distinction between what is described as prohibition and regulation. But this ignores the fact that regulatory action very often encompasses prohibitions against various activities. As the concurring opinion acknowledges, this distinction is essentially one of semantics, and I would not indulge in such wordplay as a means of limiting the broad regulatory authority which has been provided the Trustees by statute.
The majority's real concern appears to be not so much that the proposed rule regulates anchoring or mooring, but rather with the Trustees' reasons for prohibiting such use of sovereignty submerged lands in furtherance of the described gambling cruises. But as the majority emphasize, a determination as to whether the day cruise gambling industry should be preserved and facilitated through use of sovereignty lands is a matter of legislative concern.[9] The legislature has given the Trustees rulemaking authority under section 253.03(7)(b), and the Trustees have acted pursuant to that rulemaking authority. If any question remains as to whether the *708 Trustees have acted in an arbitrary manner this could be explored at an evidentiary hearing, but it does not impact our review of the summary final order now being appealed. I would reverse this order because the proposed rule is within the scope of the Trustees' specific regulatory power under section 253.03(7)(b).
NOTES
[1] This language appears not only in an unnumbered paragraph following subparagraph 120.52(8)(g), Florida Statutes (Supp.1996), (known as the "flush left" paragraph), but also at section 120.536(1), Florida Statutes (Supp.1996).
[2] Compare Stephen T. Maher, How the Glitch Stole Christmas: The 1997 Amendments to the Florida Administrative Procedure Act, 25 Fla. St. U.L.Rev. 235, 242 n. 33 (1998) (predicting that "the adoption of the so-called map tack provision, which requires that agencies be able to show specific statutory rulemaking authority for the rules they adopt, promises to make rule challenges easier to win") with Patrick L. "Booter" Imhof & James Parker Rhea, Legislative Oversight, Fla. B.J., Mar. 1997, at 28, 30 ("While the bases for agency rulemaking authority have been restricted by the act, it remains to be seen how the enunciated standard will be applied by the courts....")
[3] While the Legislature disavowed any intention "to reverse the result of any specific judicial decision," Ch. 99-379, § 1, Laws of Fla., it explicitly rejected the rule of decision that had yielded the result in St. Johns River Water Mgmt. Dist. v. Consolidated-Tomoka Land Co., 717 So.2d 72 (Fla. 1st DCA 1998). See David M. Greenbaum & Lawrence E. Sellers, Jr., 1999 Amendments to the Florida Administrative Procedure Act: Phantom Menace or Much Ado About Nothing?, 27 Fla. St. U.L.Rev. 499, 507-10, 513-16 (2000).
[4] As succinctly stated by one commentator,

The legislature was not pleased with th[is] court's interpretation of the [1996] standard, and legislation was passed in 1999 to overturn the Consolidated-Tomoka analysis.
Donna E. Blanton, State Agency Rulemaking Procedures and Rule Challenges, Fla. B. J., Jan. 2001 at 34, 35. The Florida Supreme Court was not considering a rulemaking issue in Florida Dep't of Business and Prof'l Regulation v. Inv. Corp., 747 So.2d 374, 378-80 (Fla.1999) and did not address the 1999 amendments to the Administrative Procedure Act in the course of obiter dicta there.
[5] Section 120.52(8) lists the following circumstances under which a proposed or existing rule is invalid, and specifies that the rule is invalid

if any one of the following applies:
(a) The agency has materially failed to follow the applicable rulemaking procedures or requirements set forth in this chapter;
(b) The agency has exceeded its grant of rulemaking authority, citation to which is required by s. 120.54(3)(a)1.;
(c) The rule enlarges, modifies, or contravenes the specific provisions of law implemented, citation to which is required by s. 120.54(3)(a)1.;
(d) The rule is vague, fails to establish adequate standards for agency decisions, or vests unbridled discretion in the agency;
(e) The rule is arbitrary or capricious;
(f) The rule is not supported by competent substantial evidence; or
(g) The rule imposes regulatory costs on the regulated person, county, or city which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.
§ 120.52(8), Fla. Stat. (1999). The ALJ properly concluded that the Trustees' proposed rule violated subparagraphs (b) and (c) of section 120.52(8), and thus was invalid.
[6] Instances in which the Legislature has authorized executive branch agencies to implement constitutional provisions by adopting administrative rules are not unheard of. In Florida Marine Fisheries Comm'n v. Pringle, 736 So.2d 17, 21-22 (Fla. 1st DCA 1999) (footnote omitted), we noted:

At the time the Florida Supreme Court decided Department of Environmental Protection v. Millender, 666 So.2d 882 (Fla.1996), the MFC had no authority to promulgate rules implementing the net ban amendment. Although the MFC had certain specified authority to promulgate rules implementing other provisions of chapter 370, the Legislature had delegated no authority with particular regard to the restrictions and prohibitions set out in the net ban amendment, at the time Millender was decided.
After the Millender decision, the Legislature granted the MFC authority to promulgate rules implementing the restrictions and prohibitions of the net ban amendment. See Chs. 97-160, § 39, at 3042 & 97-164, § 21, at 3093, Laws of Fla. (codified at § 370.093, Fla. Stat. (1997)); see also Ch. 98-203, § 6, at 1924-25, Laws of Fla. Now that the MFC has such authority, including the power to set gear specifications and prohibitions, see § 370.027(2), Fla. Stat. (1997), courts must respect the Legislature's allocation of primary jurisdiction over these matters to the MFC and refrain from unwarranted intrusions into the administrative process. See Key Haven Associated Enters., 427 So.2d at 157; Butler v. State, Dep't of Ins., 680 So.2d 1103, 1106 (Fla. 1st DCA 1996).
[7] In addition, the notice of rule development lists section 253.04, Florida Statutes (1999), which provides in pertinent part:

(1) The Board of Trustees of the Internal Improvement Trust Fund may police; protect; conserve; improve; and prevent trespass, damage, or depredation upon the lands and the products thereof, on or under the same, owned by the state as set forth in s. 253.03.
Also listed and also adding nothing to the analysis are sections 253.001 and 253.77, Florida Statutes (1999).
[8] The Legislature has refused, not once, but twice, to enact general legislation prohibiting cruises to nowhere. See SB 2324 (2000) and HB 2373 (1996 Session). Compare United States v. Mitchell, 39 F.3d 465, 469 n. 6 (4th Cir.1994) ("Silence is an unreliable source of legislative intent."); Fleeman v. Case, 342 So.2d 815, 817 (Fla.1976) ("We decline to divine legislative intent ... from one attempt to amend [even a] proposed law in one chamber of the Legislature [despite the proposed law's enactment that session]."); Duer v. Moore, 765 So.2d 743, 745 (Fla. 1st DCA 2000) ("Nor do we rely in any way on the reported failure, in a subsequent legislative session, of an effort to amend [a statute]"); Ellsworth v. Insurance Co. of N. Am., 508 So.2d 395, 398 (Fla. 1st DCA 1987) ("[T]he effect of the ... amendments is not determinative of legislative intent with respect to the [original enactment].") with State, Dep't of Ins. v. Insurance Servs. Office, 434 So.2d 908, 911 (Fla. 1st DCA 1983) (declaring that Legislature's consideration of, and refusal to enact, proposed legislation is "strong evidence" that agency was not authorized to promulgate rules doing what the Legislature refused to do).
[9] In an attempt to support their view with some measure of legislative intent, the majority variously and somewhat inconsistently rely on a recent enactment and prior bills which were not enacted. This reference to a recent special law by which the Trustees were allowed to lease a pier to a municipality with a condition that day cruise gambling vessels not be allowed to use the premises, and prior bills which would have generally prohibited such cruises, does not diminish the Trustees' regulatory authority under section 253.03(7)(b). Indeed, if these legislative determinations had any bearing upon the Trustees' regulatory authority, they might provide further support for the notion that while this gambling industry is not absolutely prohibited it may be precluded from using sovereignty submerged lands to foster such business.