# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4768

_____

SUSAN SNYDER,

    Appellant,

    v.

FLORIDA PREPAID COLLEGE
BOARD,

    Appellee.

_____


On appeal from the Circuit Court for Leon County.
John C. Cooper, Judge.

March 13, 2019


M.K. THOMAS, J.

Susan Snyder appeals an order granting final summary judgment in favor of the Florida Prepaid College Board (the "Board"). She argues summary judgment is improper because the terms of the contract obligated the Board to pay the value of the Tuition Differential Fee ("TDF"), a fee implemented by the Legislature after she purchased a Florida Prepaid Tuition Plan. Alternatively, she argues the prepaid plan contract is ambiguous and, therefore, precludes summary judgment. We disagree and affirm.

## I. Facts

The Legislature created the Florida Prepaid College Program ("Florida Prepaid") as a means for participants to lock-in and prepay certain costs of a future postsecondary education. § 1009.98(1), Fla. Stat. (2018) (describing the current Stanley G. Tate Florida Prepaid College Program). Florida Prepaid is administered by the Board, which has statutorily defined rights and duties. § 1009.971, Fla. Stat. (2018). The Legislature has authorized the Board to offer various prepaid plan options, or advance payment contracts, each of which includes statutorily defined benefits. § 1009.98(2), Fla. Stat. (2018).

### A. Snyder's Tuition Plan

In 2004, Snyder purchased a prepaid plan from the Board and designated her son as the beneficiary. During the 2003-2004 Open Enrollment Period, the Board offered three different plan options. Snyder selected and purchased the 4-Year University Tuition Plan.[1] In the Tuition Plan, the Board was authorized to provide "prepaid registration fees for a specified number of undergraduate semester credit hours . . . ." *See* § 1009.98(2)(b)1., Fla. Stat. (2003). As part of the contract, Snyder accepted the Board's Master Covenant, which set forth the policies and terms of Florida Prepaid. The governing document at the time of Snyder's purchase was entitled 2003-2004 Master Covenant ("03/04 MC"). Under the provisions of the 03/04 MC, Snyder would prepay "120 semester credit hours of tuition at a state university," and the Board would later pay her son's chosen institution 120 credit hours of "registration fees." The 03/04 MC defined "registration fee" to mean "the fee charged for tuition and includes the matriculation fee, financial aid fee, building fee, and Capital Improvement Trust

---

[1] Other plan options offered at the time were the "Local Fee Plan," which applied to the "activity and service, health, and athletic fees," and the "Dormitory Plan," which applied to the fee charged for residence. At present, the Board is authorized to offer six different plan options. *See* § 1009.98(2), Fla. Stat. (2018).

2

Fund fee." This definition was similar to that found in chapter 1009 at the time. *See* § 1009.97(3)(g), Fla. Stat. (2003) (defining "registration fee" to mean "tuition fee, financial aid fee, building fee, and Capital Improvement Trust Fund fee").[2]

Snyder's prepaid plan contract equally applied whether her son went to an in-state or an out-of-state institution, with some exceptions not relevant here. The 03/04 MC provided, "The Board will transfer an amount not to exceed the current rates at state universities and community colleges in Florida" and at "an amount not to exceed the redemption value of the advance payment contract at a state postsecondary institution." *See* § 1009.98(3), Fla. Stat. The 03/04 MC also expressly detailed that the beneficiary was responsible for any additional fees charged by state universities and community colleges, "including but not limited to application fees, laboratory fees, meal plan fees, and security deposits." The redemption value of the advance payment contract for 4-Year University Tuition Plans, if the beneficiary attended school out-of-state, "shall be the average amount of tuition . . . charged by the state universities . . . at the time of matriculation." Fla. Admin. Code R. 19B-9.003 (2001).

## B. *The Tuition Differential Fee*

In 2007, the Legislature authorized state universities to impose a new fee – the TDF. *See* Ch. 2007-225 § 1, Laws of Fla. The Legislature did not include the TDF in the definition of tuition or registration fee, but created it as a separate, statutorily defined fee. *See* §§ 1009.01(3), 1009.24(16), Fla. Stat. (2007). "Tuition differential" is defined as "the supplemental fee charged to a student for instruction provided by a public university in this state pursuant to s. 1009.24(15)." § 1009.01(3), Fla. Stat. (2007).[3] However, the Legislature excluded pre-existing Florida Prepaid

---

[2] The building fee was merged into the Capital Improvement Trust Fund fee in 2012. Ch. 2012-134, § 22, Laws of Fla.

[3] In 2009, section 1009.01(3), Florida Statutes, was amended to define the TDF as, "the supplemental fee charged to a student by a public university in this state pursuant to s. 1009.24(16)."

participants like Snyder from paying the TDF: "Beneficiaries having prepaid tuition contracts pursuant to s. 1009.98(2)(b) which were in effect on July 1, 2007, and which remain in effect, are exempt from the payment of the tuition differential." Ch. 2007-225, § 2, Laws of Fla. (amending § 1009.24, Fla. Stat.); § 1009.24(16)(b)5., Fla. Stat. (2018).

In 2009, the TDF provision was further amended to allocate seventy percent of its revenue to "undergraduate education" and thirty percent to student financial aid. *See* Ch. 2009-98, § 3, Laws of Fla. (amending § 1009.24, Fla. Stat.). Also, the Board authorized the purchase of a separate plan to cover the TDF which may be purchased in conjunction with a Tuition Plan. *See* § 1009.98(2)(b)4., Fla. Stat. (2018).

### C. Enrollment in an Out-of-State Institution

Snyder's son elected to attend a non-Florida state institution – the Citadel in South Carolina. As per the terms of Snyder's prepaid plan contract, the Board paid the Citadel for 120 hours of "registration fees" as that term was defined in the contract at a rate of $116.00 per credit hour. Snyder, however, argued the Board underpaid, as she interpreted the Board's obligation in the 03/04 MC to require transfer of an amount per credit hour determined at "the current rate" of in-state schools which she asserts should include the value of the TDF. Snyder concedes the Board was paying her son's tuition at the statutorily defined rate. The Board paid to the Citadel the exact amount it would have paid to any Florida university if Snyder's son was attending class in-state. The difference between the amount the Board actually paid and the amount Snyder claimed the Board owed (the amount of the TDF), is approximately $10,000 over the course of four years.[4]

---

[4] Both the 03/04 MC and the 2016-2017 Master Contract ("16/17 MC") allow subscribers to use their plan benefits at eligible institutions outside of Florida. No material differences exist between the two versions of the master contracts with regard to the use of Tuition Plan benefits at an eligible out-of-state institution.

4

In 2015, Snyder sued the Board for declaratory and monetary relief, arguing the Board was not paying as contemplated under the 03/04 MC. She asserted claims for breach of contract, declaratory relief, and breach of the covenant of good faith and fair dealing. Notably, Snyder never sought as part of her relief a rescission of the contract, nor did she seek a refund under the terms of the contract. Instead, she sought only payment of an additional benefit to her Tuition Plan – the value of the TDF. She argued, under the 03/04 MC and Florida Prepaid promotional materials, she understood the Board would pay out-of-state tuition based on the "current rates" at Florida universities and colleges, and because "current rates" necessarily must now include the TDF, she was also entitled to payment of the TDF value.

The trial court ultimately rejected Snyder's claims and entered an order granting final summary judgment in the Board's favor. This is Snyder's appeal.

## II. Analysis

We review an order granting final summary judgment *de novo*. *Volusia Cty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000). "Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law." *Id.* The issue in this case turns on the trial court's interpretation of Snyder's prepaid plan contract as well as the statutes and regulations governing Florida Prepaid, which we also review *de novo*. *Tierra Holdings, Ltd. v. Mercantile Bank*, 78 So. 3d 558, 562 (Fla. 1st DCA 2011); *Imagine Ins. Co. v. State ex rel. Dep't of Fin. Servs.*, 999 So. 2d 693, 696 (Fla. 1st DCA 2008).

In granting final summary judgment for the Board, the trial court concluded the amended master contract in effect at the time of final summary judgment proceedings, the 2016-2017 Master Contract ("16/17 MC"), governed the parties' relationship and, by its unambiguous language, precluded Snyder's entitlement to the value of the TDF. In the alternative, it concluded under either the 03/04 MC or the 16/17 MC, Snyder's Tuition Plan did not include the value of the TDF. We agree with the trial court's analysis.

5

*A. The 16/17 Master Contract Governs the Parties' Relationship*

Snyder argues the trial court erred in holding the 16/17 MC governed the parties' relationship. She asserts this holding erroneously condones the Board's unrestricted right to serially and materially amend the parties' agreement, resulting in an impairment of her rights. We disagree.

The Board manages Florida Prepaid on behalf of all participants, not just Snyder. *See* § 1009.971, Fla. Stat. (2018). The Board's role is to administer Florida Prepaid as the program is created and amended by the Legislature. *See State, Bd. of Trs. of the Internal Improvement Trust Fund v. Day Cruise Ass'n, Inc.*, 794 So. 2d 696, 700-01 (Fla. 1st DCA 2001) (recognizing most administrative agencies are creatures of statute and have only those powers the statutes confer). The Board implements the Legislature's vision for Florida Prepaid through the administrative rulemaking process. *See* §§ 120.52(8), 120.536, 1009.971(4)(aa) Fla. Stat. (2018). The preamble to the 03/04 MC makes clear the larger scope of the Board's responsibility:

> The applicable provisions of part IV, Chapter 1009, Florida Statutes, rules contained in Chapters 19B-4 through 19B-13 and Rule Chapter 19B-15, Florida Administrative Code, and s. 529 of the Internal Revenue Code, as amended from time to time, shall apply to the contract and are incorporated by reference.

That is, the Florida Prepaid statutes must necessarily govern and provide the contextual framework for all advance payment contracts into which the Board, as the contracting authority for Florida Prepaid, enters. The language of the 03/04 MC preamble expressly placed Snyder on notice that her contract was subject to the statutory and regulatory framework at the time and "as amended from time to time." *See Century Vill., Inc. v. Wellington, E,F,K,L,H,J,M,& G Condo. Ass'n.*, 361 So. 2d 128, 133 (Fla. 1978) (upholding a contract provision that incorporated by reference provisions of the Condominium Act, "as it may be amended from time to time," and finding this language was clear the parties intended amendments would become a part of the controlling document whenever they were enacted); *Sans Souci v. Div. of Fla.*

6

*Land Sales & Condos., Dep't of Bus. Regulation*, 421 So. 2d 623, 629 (Fla. 1st DCA 1982) (discussing the "automatic amendment theory" and explaining the legal effect of an amendment clause is to apply all subsequent amendments of the specific law to the declaration, as if expressed therein). Further, Snyder is presumed to know that, upon contracting with the Board, her contract incorporated the overall statutory and regulatory Florida Prepaid framework as well. *See Westside EKG Assocs. v. Found. Health*, 932 So. 2d 214, 216 (Fla. 4th DCA 2005) ("It is an accepted principle of law that when parties contract upon a matter which is the subject of statutory regulation, the parties are presumed to have entered into their agreement with reference to such statute, which becomes a part of the contract, unless the contract discloses a contrary intention.").

Not only did the preamble put Snyder on notice her contract was subject to amendments in the Florida Prepaid program as a whole, the master contract is incorporated by reference into Florida Administrative Code Rule 19B-4.001(2). As the need for a new or amended master contract arises with legislative changes to Florida Prepaid, the rule is amended to incorporate the latest version of the master contract, which amendment must necessarily apply to Snyder as per the terms of the 03/04 MC preamble. Any prejudice flowing to Snyder by virtue of the amendments is remedied by the fact that the Board's administrative rulemaking process provides notice and an opportunity for public comment. *See Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (recognizing that reserving the right to unilaterally modify a contract must be subject to certain restrictions such as reasonable notice so as to not render the contract illusory). We find no merit in Snyder's suggestion the Board, as a state agency, has no capacity to amend the parties' agreement. As the trial court recognized, we have approved an agency's use of administrative rules to govern the substance of "continuing contracts." *See, e.g.*, *United Faculty of Fla. v. Fla. State Bd. of Educ.*, 157 So. 3d 514, 517-18 (Fla. 1st DCA 2015) (upholding the State Board of Education's ability to adopt rules governing certain employment contracts for college instructional personnel).

7

The trial court correctly determined that Snyder's contract with the Board was not a static document and that the Board was able to amend its overall contractual program by way of administrative rulemaking to keep up with legislative changes to Florida Prepaid. We agree with the trial court that the preamble language of the 03/04 MC appropriately incorporated the administrative rules and statutes, as amended, into the parties' contract and put Snyder on notice that she was agreeing to be bound by the current version of the master contract. As such, the trial court appropriately determined the plain language of the 03/04 MC mandates that the current, amended master contract prevails.

## B. The 16/17 Master Contract is Unambiguous

We must look to the plain language of the 16/17 MC to determine whether Snyder is entitled to the value of the TDF as part of her prepaid tuition plan. *See Columbia Bank v. Columbia Developers, LLC,* 127 So. 3d 670, 673 (Fla. 1st DCA 2013) ("The cardinal rule of contractual construction is that when the language of the contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning."). When a contract is clear and unambiguous, the court's role is to enforce the contract as written, not to rewrite the contract to make it more reasonable for one of the parties. *Id.* (citing *Ferreira v. Home Depot/Sedgwick CMS*, 12 So. 3d 866, 868 (Fla. 1st DCA 2009)). Snyder concedes the 16/17 MC is clear and unambiguous.

Under the 16/17 MC, a Tuition Plan covers "registration fees" for 120 semester credit hours, but expressly excludes the TDF, which is covered under a separately purchased plan. The 16/17 MC defines "registration fee" with reference to the specific statutorily defined components: the tuition fee authorized in section 1009.24(4), the financial aid fee authorized in section 1009.24(7), and the Capital Improvement Trust Fund Fee authorized in section 1009.24(7). The 16/17 MC provides the Board will transfer to out-of-state institutions "an amount not to exceed the current average rates *payable under the Beneficiary's plan(s)* to a State University or Florida College." (Emphasis added.) A pre-2007 purchaser of a Florida Prepaid Plan would never have to pay the TDF because of the express Legislative

8

exemption. Pursuant to the plain language of the contract, the value of the TDF is not transferable to an out-of-state institution and Snyder's prepaid plan does not include the value of the TDF. In this regard, the trial court appropriately granted summary judgment for the Board.

## C. The 03/04 Master Covenant is Unambiguous

The trial court also upheld summary judgment on an alternative basis: no matter which Master Contract controlled, Snyder was not entitled to the value of the TDF under the prepaid plan she purchased. Snyder maintains that the 03/04 MC controls and not the 16/17 MC. Furthermore, she asserts that under the 03/04 MC, the term "current rates" is ambiguous. We cannot agree. When read in context, it is clear that "current rates" are the rates of fees covered by Florida Prepaid, here registration fees, not the rates of other fees that the purchaser's plan does not cover. The use of the term "transfer" in section 5.06 of the 03/04 MC and in section 1009.98(3) illustrates the amount payable to an out-of-state institution is not a separate benefit, but is the same benefit the beneficiary would have received at an in-state institution. Snyder's interpretation is absurd as it would result in a windfall to students who leave Florida to acquire their education. Further, if a Tuition Plan was intended to cover the TDF, then the legislative decision to authorize the Board to offer TDF Plans would be nonsensical.

Even if we agreed with Snyder that the 16/17 MC does not control, in order to reverse summary judgment, we would have to find some dispute of fact. Snyder has failed to identify facts in dispute. Accordingly, we would have to accept Snyder's interpretation of the contract as reasonable. *See Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) (recognizing where an ambiguous provision in a contract is susceptible to more than one interpretation, there is an issue of fact as to the parties' intent that cannot properly be resolved by summary judgment). The crux of Snyder's argument is that the TDF is tuition by another name and that it comprises a portion of the "current rates" at Florida universities and community colleges, so the only reasonable interpretation of the 03/04 MC is that she

9

is entitled to the value of the TDF. The trial court appropriately found this interpretation unreasonable.

In the 03/04 MC, the Board pledged to transfer "an amount not to exceed the current rates at state universities and community colleges in Florida" to a beneficiary who elected to attend an out-of-state institution. The corresponding provision in section 1009.98(2)(b) states the Board "shall provide prepaid registration fees for a specified number of undergraduate semester credit hours not to exceed the average number of hours required for the conference of a baccalaureate degree." § 1009.98(2)(b)1., Fla. Stat. (2003). The 03/04 MC tracks the language of chapter 1009 when it defines "Registration fee" as "the fee charged for tuition and includes the matriculation fee,[5] financial aid fee, building fee, and Capital Improvement Trust Fund Fee." *See* § 1009.97(3)(g), Fla. Stat. (2003). It is clear that at the time the parties entered into contract, the Board was obligated to transfer more than just "tuition" under a Tuition Plan, but the extra amount included only those fees referenced in the definition of "registration fee." The 03/04 MC made this clear by its provision indicating the beneficiary was responsible for additional fees.

What undermines Snyder's argument is the Legislature's decision to define the TDF separately from tuition or registration fee. *See* §§ 1009.01(1), (3), Fla. Stat. (2007) (defining "tuition" and "tuition differential" separately); § 1009.24, Fla. Stat. (2007) (authorizing different rates for tuition and the TDF). With the amendments in 2007, the Legislature included subsection 1009.98(2)(b)3., which authorized the Board to provide advance payment contracts for the TDF authorized in section 1009.24(16) "in conjunction with advance payment contracts for registration fees." § 1009.98(2)(b)3., Fla. Stat. (2007). The Legislature's safe-harbor for pre-2007 subscribers was designed to meet subscriber's immediate concerns, but was never intended to be an admission that TDF was a tuition increase.

---

[5] The term "matriculation fee" was not defined in the 03/04 MC, but the trial court received testimony that, at the time, it was used interchangeably with "tuition."

Although she never purchased a TDF Plan, and although her son is statutorily exempt from ever paying the TDF, Snyder demands the Board pay the TDF value because her son decided to attend an out-of-state school. She asks this Court to award her son, and all other beneficiaries who use their prepaid benefits outside of Florida, an additional $45 per credit hour. This would represent a 42% bonus for those who elected to attend out-of-state schools over and above the tuition payable to in-state students.

Snyder has received exactly what she bargained for even under the 03/04 MC - "an amount not to exceed the current rates at state universities and community colleges in Florida." While the term "current rates" is not defined, it must be specific to the current rates *for her son*. That is, whether Snyder's son went in-state or out-of-state, the Board would never disburse the TDF because he was exempt. This comports with the Board's authority in section 1009.98(3), Florida Statutes (2018), to transfer "an amount not to exceed the redemption value of the advance payment contract at a state postsecondary institution." "Redemption value" must necessarily mean the value of what Snyder actually purchased, not additional fees under other prepaid plan options that she did not.

Snyder's interpretation of the 03/04 MC cannot stand because it would contravene the express language of the contract prohibiting the Board from distributing an amount exceeding "current rates" at in-state institutions. Her interpretation would also produce an absurd result because it would result in a higher disbursement of funds to out-of-state students than in-state students. Such a reading cannot stand. *See Companion Prop. & Cas. Ins. Co. v. Category 5 Mgmt. Grp., LLC*, 189 So. 3d 905, 908 (Fla. 1st DCA 2016) ("A court must construe a contract in a manner that accords with reason and probability and avoids an absurd construction.").

Snyder argues that even if this Court does not accept her interpretation of the contract, it should reverse summary judgment upon the finding that the 03/04 MC is, at least, ambiguous. No ambiguity can be found where Snyder's reading would produce an absurd result. *See CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015) ("A contract is ambiguous

11

when it is susceptible to more than one reasonable interpretation, but where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner." (internal quotation and citation omitted)); *Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 466-67 (Fla. 5th DCA 2018) (recognizing a true ambiguity only exists when it is susceptible to more than one reasonable interpretation).

## D. No Unconstitutional Impairment of Contract

Snyder asserts the Board's arguments here diminish her contractual rights to the "value" of the plan. Specifically, that the purpose of these plans is to cover the "actual cost" of college, and that her Tuition Plan now provides substantially less "value" because the Board does not transfer the TDF to out-of-state institutions. Having found the language of the 16/17 MC to be unambiguous, Snyder's position becomes one for an illusory contract. However, on appeal Snyder explicitly clarified that "the Court should not support any construction of the parties' agreement, or the powers of the Board or legislature, which would render [Snyder's] stated contractual rights illusory." Snyder does not seek rescission of the contract nor repayment of the original cost of the Tuition Plan.

To impair a preexisting contract, a law must "have the effect of rewriting antecedent contracts" in a manner that "chang[es] the substantive rights of the parties to existing contracts." *Manning v. Travelers Ins. Co.*, 250 So. 2d 872, 874 (Fla. 1971). Here, Snyder fails to address the criteria that courts must weigh to assess whether a contract has been unlawfully impaired. *See Searcy, Denney, Scarola, Barnhart & Shipley, Etc. v. State*, 209 So. 3d 1181, 1192 (Fla. 2017) (explaining that an impairment-of-contract claim requires a court to balance the nature and extent of the impairment against the importance of the State's objective and the degree of intrusion into the bargain). She also fails to identify any law that impairs any specific provision of the 16/17 MC. Her argument is that the Board's "construction" of the law impairs its "essential commitment" to cover the cost of postsecondary education. However, to establish this "essential commitment," Snyder points to minutes of meetings and a promotional flyer. This

12

is insufficient to state a colorable claim. *See id.* at 1190–91 (explaining that, "[t]o impair a preexisting contract, a law must have the effect of rewriting antecedent contracts" (internal quotation marks omitted)).

Courts are obligated to construe contracts in such a way as to give reasonable meaning to all provisions of a contract, rather than one which leaves part of the contract useless or inexplicable. *Aucilla Area Solid Waste Admin. v. Madison Cty.*, 890 So. 2d 415, 416 (Fla. 1st DCA 2004); *Hardwick Properties, Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998) (citing *Premier Ins. Co. v. Adams,* 632 So. 2d 1054 (Fla. 5th DCA 1994)). Neither the 16/17 MC nor Florida law has ever purported to cover in full the "actual cost" of a postsecondary education, including each and every one of the many fees the Legislature has authorized the universities to charge. *See* § 1009.24(7)-(17), Fla. Stat. The explanation of different fees, and authorization of various advance payment plans and contracts that cover different costs, refutes Snyder's claim that the "intent" of university Tuition Plans is to cover all costs. "Value" has as its foundation a reasonable basis of "cost." Here, the TDF is not part of the "actual cost" that Snyder's son will ever pay. He is exempt from the TDF and he will never be charged the TDF whether he acquires his degree exclusively out-of-state or attends school in Florida. As Snyder concedes, the 4-Year University Tuition Plan she purchased is not an investment program. It is a contract to fix or "lock-in" postsecondary institution rates at the time of purchase. Snyder has received the value of the contract.

## *Conclusion*

Based on the undisputed material facts, the trial court correctly determined that Snyder failed to demonstrate that the Board breached any provision of the tuition plan, that she suffered any damages as a result, that the Board breached an implied covenant or that a present controversy existed regarding declaratory relief. Accordingly, we affirm the trial court's order granting final summary judgment in favor of the Board.

AFFIRMED.

JAY, J., concurs; WOLF, J., concurs in result only.

13

———————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————

David J. Sales of David J. Sales, P.A., Sarasota; Daniel R. Hoffman of David J. Sales, P.A., Sarasota; James W. Gustafson of Searcy, Denney, Scarola, Barnhart & Shipley, P.A., Tallahassee; Edward H. Zebersky and Jordan Shawn of Zebersky & Payne, LLP, Fort Lauderdale, for Appellant.

Michael E. Riley, Jason L. Unger, Ashley Hoffman Lukis, and Andy V. Bardos of GrayRobinson, P.A., Tallahassee; Jason A. Zimmerman of GrayRobinson, P.A., Orlando, for Appellee.