# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-2027
_____

SOUTHERN BAPTIST HOSPITAL OF
FLORIDA d/b/a BAPTIST MEDICAL
CENTER NASSAU; SOUTHERN
BAPTIST HOSPITAL OF FLORIDA
d/b/a BAPTIST MEDICAL CENTER
OF THE BEACHES; SOUTHERN
BAPTIST HOSPITAL OF FLORIDA
d/b/a BAPTIST MEDICAL CENTER;
MARTIN MEMORIAL MEDICAL
CENTER; SOUTH LAKE HOSPITAL;
ORLANDO HEALTH, INC. d/b/a
ORLANDO HEALTH; ORLANDO
HEALTH CENTRAL, INC. d/b/a
HEALTH CENTRAL,

     Appellants,

     v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

     Appellee.

_____

No. 1D17-2028
_____

SOUTHERN BAPTIST HOSPITAL OF
FLORIDA d/b/a BAPTIST MEDICAL
CENTER NASSAU; SOUTHERN
BAPTIST HOSPITAL OF FLORIDA
d/b/a BAPTIST MEDICAL CENTER
OF THE BEACHES; SOUTHERN
BAPTIST HOSPITAL OF FLORIDA
d/b/a BAPTIST MEDICAL CENTER;
MARTIN MEMORIAL MEDICAL
CENTER; SOUTH LAKE HOSPITAL;
ORLANDO HEALTH, INC. d/b/a
ORLANDO HEALTH; ORLANDO
HEALTH CENTRAL, INC. d/b/a
HEALTH CENTRAL,

     Appellants,

     v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

     Appellee.

THE PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA, which governs and operates JACKSON HEALTH SYSTEM, including JACKSON MEMORIAL HOSPITAL, JACKSON NORTH MEDICAL CENTER and JACKSON SOUTH COMMUNITY HOSPITAL,

Appellants,

v.

AGENCY FOR HEALTH CARE ADMINISTRATION,

Appellee.

_____

No. 1D17-2034

_____

MIAMI BEACH HEALTHCARE
GROUP, LTD., d/b/a AVENTURA
HOSPITAL AND MEDICAL CENTER;
HCA HEALTH SERVICES OF
FLORIDA, INC., d/b/a BLAKE
MEDICAL CENTER; GALENCARE,
INC., d/b/a BRANDON REGIONAL
HOSPITAL; TALLAHASSEE
MEDICAL CENTER, INC., d/b/a
CAPITAL REGIONAL MEDICAL
CENTER; CENTRAL FLORIDA
REGIONAL HOSPITAL, INC., d/b/a
CENTRAL FLORIDA REGIONAL
HOSPITAL; CITRUS MEMORIAL
HOSPITAL, INC., d/b/a CITRUS
MEMORIAL HOSPITAL; SARASOTA
DOCTORS HOSPITAL, INC., d/b/a
DOCTORS HOSPITAL OF
SARASOTA; ENGLEWOOD
COMMUNITY HOSPITAL, INC.,
d/b/a ENGLEWOOD COMMUNITY
HOSPITAL; FAWCETT MEMORIAL
HOSPITAL, INC., d/b/a FAWCETT
MEMORIAL HOSPITAL; FORT
WALTON BEACH MEDICAL
CENTER, INC., d/b/a FORT
WALTON BEACH MEDICAL
CENTER; BAY HOSPITAL, INC.,
d/b/a GULF COAST MEDICAL
CENTER; JFK MEDICAL CENTER
LIMITED PARTNERSHIP, d/b/a
JFK MEDICAL CENTER; JFK
MEDICAL CENTER LIMITED
PARTNERSHIP, d/b/a JFK
MEDICAL CENTER-NORTH
CAMPUS; KENDALL HEALTHCARE

4

GROUP, LTD., d/b/a KENDALL REGIONAL MEDICAL CENTER; NOTAMI HOSPITALS OF FLORIDA, INC., d/b/a LAKE CITY MEDICAL CENTER; LARGO MEDICAL CENTER, INC., d/b/a LARGO MEDICAL CENTER; LARGO MEDICAL CENTER, INC., d/b/a LARGO MEDICAL CENTER-INDIAN ROCKS; LAWNWOOD MEDICAL CENTER, INC., d/b/a LAWNWOOD REGIONAL MEDICAL CENTER & HEART INSTITUTE; NEW PORT RICHEY HOSPITAL, INC., d/b/a MEDICAL CENTER OF TRINITY; NEW PORT RICHEY HOSPITAL, INC., d/b/a MEDICAL CENTER OF TRINITY WEST PASCO CAMPUS; MEMORIAL HEALTHCARE GROUP, INC., d/b/a MEMORIAL HOSPITAL JACKSONVILLE; WEST FLORIDA – MHT, LLC, d/b/a MEMORIAL HOSPITAL OF TAMPA; PLANTATION GENERAL HOSPITAL LIMITED PARTNERSHIP, d/b/a MERCY HOSPITAL, A CAMPUS OF PLANTATION GENERAL HOSPITAL; NORTH FLORIDA REGIONAL MEDICAL CENTER, INC., d/b/a NORTH FLORIDA REGIONAL MEDICAL CENTER; GALENCARE, INC., d/b/a NORTHSIDE HOSPITAL; NORHTWEST MEDICAL CENTER, INC., d/b/a NORTHWEST MEDICAL CENTER; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a OAK HOLL HOSPITAL; MARION COMMUNITY HOSPITAL, INC., d/b/a OCALA REGIONAL MEDICAL CENTER; MARION COMMUNITY

5

HOSPITAL, INC., d/b/a WEST MARION COMMUNITY HOSPITAL; ORANGE PARK MEDICAL CENTER, INC., d/b/a ORANGE PARK MEDICAL CENTER; OSCEOLA REGIONAL HOSPITAL, INC., d/b/a OSCEOLA REGIONAL MEDICAL CENTER; WEST FLORIDA – PPH, LLC, d/b/a PALMS OF PASADENA HOSPITAL; PALMS WEST HOSPITAL LIMITED PARTNERSHIP, d/b/a PALMS WEST HOSPITAL; PLANTATION GENERAL HOSPITAL LIMITED PARTNERSHIP, d/b/a PLANTATION GENERAL HOSPITAL; POINCIANA MEDICAL CENTER, INC., d/b/a POINCIANA MEDICAL CENTER; PUTNAM COMMUNITY MEDICAL CENTER OF NORTH FLORIDA, LLC, d/b/a PUTNAM COMMUNITY MEDICAL CENTER; OKEECHOBEE HOSPITAL, INC., d/b/a RAULERSON HOSPITAL; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a REGIONAL MEDICAL CENTER BAYONET POINT; HCA LONG TERM HEALTH SERVICES OF MIAMI, INC., d/b/a SISTER EMMANUEL HOSPITAL; SUN CITY HOSPITAL, INC., d/b/a SOUTH BAY HOSPITAL; MEMORIAL HEALTHCARE GROUP, INC., d/b/a SPECIALTY HOSPITAL JACKSONVILLE; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a ST. LUCIE MEDICAL CENTER; GALEN OF FLORIDA, INC., d/b/a ST. PETERSBURG GENERAL HOSPITAL; WEST FLORIDA – TCH, LLC, d/b/a TAMPA

6

COMMUNITY HOSPITAL;
OKALOOSA HOSPITAL, INC., d/b/a
TWIN CITIES HOSPITAL;
UNIVERSITY HOSPITAL, LTD.,
d/b/a UNIVERSITY HOSPITAL AND
MEDICAL CENTER; WEST
FLORIDA REGIONAL MEDICAL
CENTER, INC., d/b/a WEST
FLORIDA HOSPITAL; and
COLUMBIA HOSPITAL
CORPORATION OF SOUTH
BROWARD, d/b/a WESTSIDE
REGIONAL MEDICAL CENTER,

 Appellants,

 v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

 Appellee.

No. 1D17-2035

THE PUBLIC HEALTH TRUST OF
MIAMI-DADE COUNTY, FLORIDA,
which governs and operates
JACKSON HEALTH SYSTEM,
including JACKSON MEMORIAL
HOSPITAL, JACKSON NORTH
MEDICAL CENTER and JACKSON
SOUTH COMMUNITY HOSPITAL,

Appellants,

v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

Appellee.

8

MIAMI BEACH HEALTHCARE GROUP, LTD., d/b/a AVENTURA HOSPITAL AND MEDICAL CENTER; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a BLAKE MEDICAL CENTER; GALENCARE, INC., d/b/a BRANDON REGIONAL HOSPITAL; TALLAHASSEE MEDICAL CENTER, INC., d/b/a CAPITAL REGIONAL MEDICAL CENTER; CENTRAL FLORIDA REGIONAL HOSPITAL, INC., d/b/a CENTRAL FLORIDA REGIONAL HOSPITAL; CITRUS MEMORIAL HOSPITAL, INC., d/b/a CITRUS MEMORIAL HOSPITAL; SARASOTA DOCTORS HOSPITAL, INC., d/b/a DOCTORS HOSPITAL OF SARASOTA; ENGLEWOOD COMMUNITY HOSPITAL, INC., d/b/a ENGLEWOOD COMMUNITY HOSPITAL; FAWCETT MEMORIAL HOSPITAL, INC., d/b/a FAWCETT MEMORIAL HOSPITAL; FORT WALTON BEACH MEDICAL CENTER, INC., d/b/a FORT WALTON BEACH MEDICAL CENTER; BAY HOSPITAL, INC., d/b/a GULF COAST MEDICAL CENTER; JFK MEDICAL CENTER LIMITED PARTNERSHIP, d/b/a JFK MEDICAL CENTER; JFK MEDICAL CENTER LIMITED PARTNERSHIP, d/b/a JFK MEDICAL CENTER-NORTH CAMPUS; KENDALL HEALTHCARE

GROUP, LTD., d/b/a KENDALL REGIONAL MEDICAL CENTER; NOTAMI HOSPITALS OF FLORIDA, INC., d/b/a LAKE CITY MEDICAL CENTER; LARGO MEDICAL CENTER, INC., d/b/a LARGO MEDICAL CENTER; LARGO MEDICAL CENTER, INC., d/b/a LARGO MEDICAL CENTER-INDIAN ROCKS; LAWNWOOD MEDICAL CENTER, INC., d/b/a LAWNWOOD REGIONAL MEDICAL CENTER & HEART INSTITUTE; NEW PORT RICHEY HOSPITAL, INC., d/b/a MEDICAL CENTER OF TRINITY; NEW PORT RICHEY HOSPITAL, INC., d/b/a MEDICAL CENTER OF TRINITY WEST PASCO CAMPUS; MEMORIAL HEALTHCARE GROUP, INC., d/b/a MEMORIAL HOSPITAL JACKSONVILLE; WEST FLORIDA – MHT, LLC, d/b/a MEMORIAL HOSPITAL OF TAMPA; PLANTATION GENERAL HOSPITAL LIMITED PARTNERSHIP, d/b/a MERCY HOSPITAL, A CAMPUS OF PLANTATION GENERAL HOSPITAL; NORTH FLORIDA REGIONAL MEDICAL CENTER, INC., d/b/a NORTH FLORIDA REGIONAL MEDICAL CENTER; GALENCARE, INC., d/b/a NORTHSIDE HOSPITAL; NORHTWEST MEDICAL CENTER, INC., d/b/a NORTHWEST MEDICAL CENTER; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a OAK HOLL HOSPITAL; MARION COMMUNITY HOSPITAL, INC., d/b/a OCALA REGIONAL MEDICAL CENTER; MARION COMMUNITY

10

HOSPITAL, INC., d/b/a WEST MARION COMMUNITY HOSPITAL; ORANGE PARK MEDICAL CENTER, INC., d/b/a ORANGE PARK MEDICAL CENTER; OSCEOLA REGIONAL HOSPITAL, INC., d/b/a OSCEOLA REGIONAL MEDICAL CENTER; WEST FLORIDA – PPH, LLC, d/b/a PALMS OF PASADENA HOSPITAL; PALMS WEST HOSPITAL LIMITED PARTNERSHIP, d/b/a PALMS WEST HOSPITAL; PLANTATION GENERAL HOSPITAL LIMITED PARTNERSHIP, d/b/a PLANTATION GENERAL HOSPITAL; POINCIANA MEDICAL CENTER, INC., d/b/a POINCIANA MEDICAL CENTER; PUTNAM COMMUNITY MEDICAL CENTER OF NORTH FLORIDA, LLC, d/b/a PUTNAM COMMUNITY MEDICAL CENTER; OKEECHOBEE HOSPITAL, INC., d/b/a RAULERSON HOSPITAL; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a REGIONAL MEDICAL CENTER BAYONET POINT; HCA LONG TERM HEALTH SERVICES OF MIAMI, INC., d/b/a SISTER EMMANUEL HOSPITAL; SUN CITY HOSPITAL, INC., d/b/a SOUTH BAY HOSPITAL; MEMORIAL HEALTHCARE GROUP, INC., d/b/a SPECIALTY HOSPITAL JACKSONVILLE; HCA HEALTH SERVICES OF FLORIDA, INC., d/b/a ST. LUCIE MEDICAL CENTER; GALEN OF FLORIDA, INC., d/b/a ST. PETERSBURG GENERAL HOSPITAL; WEST FLORIDA – TCH, LLC, d/b/a TAMPA

11

COMMUNITY HOSPITAL;
OKALOOSA HOSPITAL, INC., d/b/a
TWIN CITIES HOSPITAL;
UNIVERSITY HOSPITAL, LTD.,
d/b/a UNIVERSITY HOSPITAL AND
MEDICAL CENTER; WEST
FLORIDA REGIONAL MEDICAL
CENTER, INC., d/b/a WEST
FLORIDA HOSPITAL; and
COLUMBIA HOSPITAL
CORPORATION OF SOUTH
BROWARD, d/b/a WESTSIDE
REGIONAL MEDICAL CENTER,

 Appellants,

 v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

 Appellee.

_____

No. 1D17-2040

_____

SACRED HEART HEALTH SYSTEM,
INC. d/b/a SACRED HEART
HOSPITAL OF PENSACOLA,
SACRED HEART HEALTH SYSTEM,
INC. d/b/a SACRED HEART
HOSPITAL ON THE EMERALD
COAST AND SACRED HEART
HEALTH SYSTEM, INC. d/b/a
SACRED HEART HOSPITAL ON THE
GULF, ST. VINCENT'S MEDICAL
CENTER, INC. d/b/a ST.
VINCENT'S MEDICAL CENTER
RIVERSIDE, ST. LUKE'S-ST.
VINCENT'S HEALTHCARE, INC.
d/b/a ST. VINCENT'S MEDICAL
CENTER SOUTHSIDE and ST.
VINCENT'S MEDICAL CENTER-
CLAY COUNTY, INC. d/b/a ST.
VINCENT'S MEDICAL CENTER-
CLAY COUNTY,

     Appellants,

    v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

     Appellee.

_____

No. 1D17-2041
_____

CGH HOSPITAL, LTD d/b/a CORAL
GABLES HOSPITAL, DELRAY
MEDICAL CENTER, INC. d/b/a
DELRAY MEDICAL CENTER, GOOD
SAMARITAN MEDICAL CENTER,
INC. d/b/a GOOD SAMARITAN
MEDICAL CENTER, HIALEAH
HOSPITAL, INC. d/b/a HIALEAH
HOSPITAL, NORTH SHORE
MEDICAL CENTER, INC. d/b/a
NORTH SHORE MEDICAL CENTER,
NORTH SHORE MEDICAL CENTER,
INC. d/b/a FLORIDA MEDICAL
CENTER – A CAMPUS OF NORTH
SHORE, PALM BEACH GARDENS
COMMUNITY HOSPITAL, INC.
d/b/a PALM BEACH GARDENS
MEDICAL CENTER, LIFEMARK
HOSPITALS OF FLORIDA, INC.
d/b/a PALMETTO GENERAL
HOSPITAL, ST. MARY'S MEDICAL
CENTER, INC. d/b/a ST. MARY'S
MEDICAL CENTER and WEST
BOCA MEDICAL CENTER, INC.
d/b/a WEST BOCA MEDICAL
CENTER,

 Appellants,

 v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

 Appellee.

14

SACRED HEART HEALTH SYSTEM, INC. d/b/a SACRED HEART HOSPITAL OF PENSACOLA, SACRED HEART HEALTH SYSTEM, INC. d/b/a SACRED HEART HOSPITAL ON THE EMERALD COAST AND SACRED HEART HEALTH SYSTEM, INC. d/b/a SACRED HEART HOSPITAL ON THE GULF AND ST. VINCENT'S MEDICAL CENTER, INC. d/b/a ST. VINCENT'S MEDICAL CENTER RIVERSIDE, ST. LUKE'S-ST. VINCENT'S HEALTHCARE, INC. d/b/a ST. VINCENT'S MEDICAL CENTER SOUTHSIDE AND ST. VINCENT'S MEDICAL CENTER-CLAY COUNTY, INC. d/b/a ST. VINCENT'S MEDICAL CENTER-CLAY COUNTY,

Appellants,

v.

AGENCY FOR HEALTH CARE ADMINISTRATION,

Appellee.

No. 1D17-2045

CGH HOSPITAL, LTD d/b/a CORAL
GABLES HOSPITAL, DELRAY
MEDICAL CENTER, INC. d/b/a
DELRAY MEDICAL CENTER, GOOD
SAMARITAN MEDICAL CENTER,
INC. d/b/a GOOD SAMARITAN
MEDICAL CENTER, HIALEAH
HOSPITAL, INC. d/b/a HIALEAH
HOSPITAL, NORTH SHORE
MEDICAL CENTER, INC. d/b/a
NORTH SHORE MEDICAL CENTER,
NORTH SHORE MEDICAL CENTER,
INC. d/b/a FLORIDA MEDICAL
CENTER – A CAMPUS OF NORTH
SHORE, PALM BEACH GARDENS
COMMUNITY HOSPITAL, INC.
d/b/a PALM BEACH GARDENS
MEDICAL CENTER, LIFEMARK
HOSPITALS OF FLORIDA, INC.
d/b/a PALMETTO GENERAL
HOSPITAL, ST. MARY'S MEDICAL
CENTER, INC. d/b/a ST. MARY'S
MEDICAL CENTER AND WEST
BOCA MEDICAL CENTER, INC.
d/b/a WEST BOCA MEDICAL
CENTER,

> Appellants,

> v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

> Appellee.

16

ADVENTIST HEALTH
SYSTEM/SUNBELT, INC., d/b/a
FLORIDA HOSPITAL HEARTLAND
MEDICAL CENTER, FLORIDA
HOSPITAL ORLANDO, and
FLORIDA HOSPITAL WACHULA;
FLORIDA HOSPITAL ORLANDO,
and FLORIDA HOSPITAL
WACHULA; FLORIDA HOSPITAL
WATERMAN, INC.; FLORIDA
HOSPITAL ZEPHYRHILLS, INC.;
MEMORIAL HEALTH SYSTEMS,
INC. d/b/a FLORIDA HOSPITAL
MEMORIAL MEDICAL CENTER;
MEMORIAL HOSPITAL FLAGLER,
INC.; MEMORIAL HOSPITAL-WEST
VOLUSIA, INC., d/b/a FLORIDA
HOSPITAL DELAND; PASCO-
PINELLAS HILLSBOROUGH
COMMUNITY HEALTH SYSTEM,
INC., d/b/a FLORIDA HOSPITAL
WESLEY CHAPEL; SOUTHEAST
VOLUSIA HEALTHCARE
CORPORATION, d/b/a FLORIDA
HOSPITAL NEW SMYRNA;
SOUTHWEST VOLUSIA
HEALTHCARE CORPORATION,
d/b/a FLORIDA HOSPITAL FISH
MEMORIAL; TARPON SPRINGS
HOSPITAL FOUNDATION, INC.,
d/b/a FLORIDA HOSPITAL NORTH
PINELLAS; and UNIVERSITY
COMMUNITY HOSPITAL, INC.,
d/b/a FLORIDA HOSPITAL NORTH
PINELLAS; and UNIVERSITY
COMMUNITY HOSPITAL, INC.,

d/b/a FLORIDA HOSPITAL
CARROLLWOOD, FLORIDA
HOSPITAL AT CONNERTON-
LTACH, and FLORIDA HOSPITAL
TAMPA,

     Appellants,

     v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

     Appellee.

BAYFRONT HMA MEDICAL CENTER, LLC, d/b/a BAYFRONT HEALTH – ST. PETERSBURG; CITRUS HMA, LLC, d/b/a SEVEN RIVERS REGIONAL MEDICAL CENTER; CRESTVIEW HOSPITAL CORPORATION, d/b/a NORTH OKALOOSA MEDICAL CENTER; HAINES CITY HMA, LLC, d/b/a HEART OF FLORIDA REGIONAL MEDICAL CENTER; HERNANDO HMA, LLC, d/b/a BAYFRONT HEALTH-BROOKSVILLE AND BAYFRONT HEALTH – SPRING HILL; HMA SANTA ROSA MEDICAL CENTER, LLC; KEY WEST HMA, LLC, d/b/a LOWER KEYS MEDICAL CENTER; LAKE SHORE HMA, LLC, d/b/a SHANDS LAKE SHORE REGIONAL MEDICAL CENTER; LAKE WALES HOSPITAL CORPORATION d/b/a LAKE WALES MEDICAL CENTER; LIVE OAK HMA, LLC, d/b/a SHANDS LIVE OAK REGIONAL MEDICAL CENTER; NAPLES HMA, LLC, d/b/a PHYSICIANS REGIONAL MEDICAL CENTER – PINE RIDGE AND PHYSICIANS REGIONAL MEDICAL CENTER – COLLIER BOULEVARD; MELBOURNE HMA, LLC; MUNROE HMA HOSPITAL, LLC, d/b/a MUNROE REGIONAL MEDICAL CENTER; OSCEOLA SC, LLC, d/b/a ST. CLOUD REGIONAL MEDICAL CENTER; PASCO

REGIONAL MEDICAL CENTER, LLC, d/b/a BAYFRONT HEALTH – DADE CITY; PORT CHARLOTTE HMA, LLC d/b/a BAYFRONT HEALTH – PORT CHARLOTTE; PUNTA GORDA HMA, LLC, d/b/a BAYFRONT HEALTH PUNTA GORDA; ROCKLEDGE HMA, LLC; SEBASTIAN HOSPITAL, LLC, d/b/a SEBASTIAN RIVER MEDICAL CENTER; SEBRING HOSPITAL MANAGEMENT ASSOCIATES, LLC, d/b/a HIGHLANDS REGIONAL MEDICAL CENTER; STARKE HMA, LLC, d/b/a SHANDS STARKE REGIONAL MEDICAL CENTER; AND VENICE HMA, LLC, d/b/a VENICE REGIONAL BAYFRONT HEALTH,

Appellants,

v.

AGENCY FOR HEALTH CARE ADMINISTRATION,

Appellee.

20

_____

No. 1D17-2051
_____

CAPE CANAVERAL HOSPITAL,
INC., HOLMES REGIONAL
MEDICAL CENTER, INC., and
VIERA HOSPITAL, INC.

    Appellants,

    v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

    Appellee.

BAYFRONT HMA MEDICAL CENTER, LLC, d/b/a BAYFRONT HEALTH – ST. PETERSBURG; CITRUS HMA, LLC, d/b/a SEVEN RIVERS REGIONAL MEDICAL CENTER; CRESTVIEW HOSPITAL CORPORATION, d/b/a NORTH OKALOOSA MEDICAL CENTER; HAINES CITY HMA, LLC, d/b/a HEART OF FLORIDA REGIONAL MEDICAL CENTER; HERNANDO HMA, LLC, d/b/a BAYFRONT HEALTH-BROOKSVILLE AND BAYFRONT HEALTH – SPRING HILL; HMA SANTA ROSA MEDICAL CENTER, LLC; KEY WEST HMA, LLC, d/b/a LOWER KEYS MEDICAL CENTER; LAKE SHORE HMA, LLC, d/b/a SHANDS LAKE SHORE REGIONAL MEDICAL CENTER; LAKE WALES HOSPITAL CORPORATION d/b/a LAKE WALES MEDICAL CENTER; LIVE OAK HMA, LLC, d/b/a SHANDS LIVE OAK REGIONAL MEDICAL CENTER; NAPLES HMA, LLC, d/b/a PHYSICIANS REGIONAL MEDICAL CENTER – PINE RIDGE AND PHYSICIANS REGIONAL MEDICAL CENTER – COLLIER BOULEVARD; MELBOURNE HMA, LLC; MUNROE HMA HOSPITAL, LLC, d/b/a MUNROE REGIONAL MEDICAL CENTER; OSCEOLA SC, LLC, d/b/a ST. CLOUD REGIONAL MEDICAL CENTER; PASCO

REGIONAL MEDICAL CENTER, LLC, d/b/a BAYFRONT HEALTH – DADE CITY; PORT CHARLOTTE HMA, LLC, d/b/a BAYFRONT HEALTH – PORT CHARLOTTE; PUNTA GORDA HMA, LLC, d/b/a BAYFRONT HEALTH PUNTA GORDA; ROCKLEDGE HMA, LLC; SEBASTIAN HOSPITAL, LLC, d/b/a SEBASTIAN RIVER MEDICAL CENTER; SEBRING HOSPITAL MANAGEMENT ASSOCIATES, LLC, d/b/a HIGHLANDS REGIONAL MEDICAL CENTER; STARKE HMA, LLC, d/b/a SHANDS STARKE REGIONAL MEDICAL CENTER; and VENICE HMA, LLC, d/b/a VENICE REGIONAL BAYFRONT HEALTH,

     Appellants,

     v.

AGENCY FOR HEALTH CARE ADMINISTRATION,

     Appellee.

23

ADVENTIST HEALTH
SYSTEM/SUNBELT, INC., d/b/a
FLORIDA HOSPITAL HEARTLAND
MEDICAL CENTER, FLORIDA
HOSPITAL ORLANDO, and
FLORIDA HOSPITAL WACHULA;
FLORIDA HOSPITAL ORLANDO,
and FLORIDA HOSPITAL
WACHULA; FLORIDA HOSPITAL
WATERMAN, INC.; FLORIDA
HOSPITAL ZEPHYRHILLS, INC.;
MEMORIAL HEALTH SYSTEMS,
INC. d/b/a FLORIDA HOSPITAL
MEMORIAL MEDICAL CENTER;
MEMORIAL HOSPITAL FLAGLER,
INC.; MEMORIAL HOSPITAL-WEST
VOLUSIA, INC., d/b/a FLORIDA
HOSPITAL DELAND; PASCO-
PINELLAS HILLSBOROUGH
COMMUNITY HEALTH SYSTEM,
INC., d/b/a FLORIDA HOSPITAL
WESLEY CHAPEL; SOUTHEAST
VOLUSIA HEALTHCARE
CORPORATION, d/b/a FLORIDA
HOSPITAL NEW SMYRNA;
SOUTHWEST VOLUSIA
HEALTHCARE CORPORATION,
d/b/a FLORIDA HOSPITAL FISH
MEMORIAL; TARPON SPRINGS
HOSPITAL FOUNDATION, INC.,
d/b/a FLORIDA HOSPITAL NORTH
PINELLAS; and UNIVERSITY
COMMUNITY HOSPITAL, INC.,
d/b/a FLORIDA HOSPITAL
CARROLLWOOD, FLORIDA
HOSPITAL AT CONNERTON-

LTACH, and FLORIDA HOSPITAL
TAMPA,

      Appellants,

      v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

      Appellee.

_____

No. 1D17-2057
_____

CAPE CANAVERAL HOSPITAL,
INC., HOLMES REGIONAL
MEDICAL CENTER, INC., and
VIERA HOSPITAL, INC.

      Appellants,

      v.

AGENCY FOR HEALTH CARE
ADMINISTRATION,

      Appellee.

_____

On appeal from a Final Order of the Division of Administrative
Hearings.
J. Lawrence Johnston, Administrative Law Judge.

April 26, 2019

M.K. THOMAS, J.

25

In this consolidated matter, Appellants[1] ("the Hospitals") appeal a final order declaring valid the Agency for Health Care Administration's ("the Agency") existing and proposed rules which implement legislative mandates to reduce reimbursement rates for Medicaid outpatient hospital services. The Hospitals argue the existing and proposed versions of Florida Administrative Code Rule 59G-6.030 are an invalid exercise of delegated legislative authority. We agree and reverse.

## I. Facts

The Hospitals provide inpatient and outpatient hospital care in Florida to Medicaid patients. Reimbursement for the services provided is based on Medicaid rates calculated by the Agency each year. The Agency is the single state agency authorized to make Medicaid payments for services rendered. *See* § 409.902(1), Fla. Stat.

Historically, the Agency reimbursed hospitals on a fee-for-service basis. Under the fee-for-service model, hospitals submitted claims to the Agency, and reimbursement was paid at an established rate. The Agency set reimbursement rates on the most recent complete and accurate cost reports submitted by each hospital, re-established the Outpatient Hospital Reimbursement Plan ("Outpatient Plan"), and adopted the Outpatient Plan by reference in Rule 59G-6.030. Beginning in 2005, the Legislature periodically included provisions in its General Appropriations Acts ("GAA"), directing the Agency to reduce hospital outpatient reimbursement rates to comply with specific budget reductions for that year. These reductions are referred to as Medicaid Trend Adjustments ("MTA").

In 2005, the GAA reported that funds appropriated for Medicaid outpatient hospital services reflected a cost savings of $16,796,807.00 "as a result of modifying the reimbursement methodology for outpatient hospital rates." The GAA further provided: "[T]he agency shall implement a recurring methodology in the [Outpatient Plan] that may include, but is not limited to, the

---

[1] 120 hospitals comprised of for-profit, not-for-profit, and governmental entities.

inflation factor, variable cost target, county rate ceiling or county ceiling target rate to achieve the cost savings." In response, the Agency amended the Outpatient Plan to provide: "Effective July 1, 2005, a recurring rate reduction shall be established until an aggregate total estimated saving of $16,796,807 is achieved each year." This directive became known as "cut 1." The Outpatient Plan was then adopted by reference in Rule 59G-6.030. After 2005, the Legislature mandated five more relevant MTA reductions through the GAAs, which are known as "cuts 2-4" and "cuts 7-8."[2] The Agency used similar language in the Outpatient Plans to address cuts 2, 3, and 8. Regarding cut 4, in the Outpatient Plan, the Agency restated the GAA as follows, "[the Agency] shall implement a recurring methodology to reduce individual outpatient hospital rates proportionately . . . ." In total, the Legislature directed the Agency to implement cuts of approximately $224 million.

From 2005 through 2009, the Agency, after collaboration with the hospitals, achieved the MTA reductions using each hospital's unaudited costs and actual occasions of service[3] in the year of the reduction. The Agency then utilized an Excel spreadsheet and the "goal seek" function therein to proportionally calculate the reduction to each hospital's outpatient rates. The Agency's goal was to spread the rate reductions equally among the hospitals.

In 2011, the Legislature instituted what became known as the "unit cost cap," a ceiling on Medicaid outpatient rates. Section 409.908, Florida Statutes, was amended to provide: "The Agency shall establish rates at a level that ensures no increase in statewide expenditures resulting from a change in unit costs effective July 1, 2011. Reimbursement rates shall be as provided

---

[2] The Legislature enacted cuts 5-6 in 2009 and 2010. However, these cuts were not taken pursuant to GAA instruction.

[3] The Outpatient Plan provides the following definition: "Florida Medicaid outpatient occasions of service – the number of distinct revenue center code line items listed on a valid claim that a hospital has filed . . . and that have been paid by the fiscal agent, which represent covered Florida Medicaid outpatient services."

27

in the General Appropriations Act." § 409.908(23)(a), Fla. Stat. (2011).  The GAA that year further elaborated:

> In establishing rates through the normal process, prior to including this reduction [cut 7], if the unit cost is equal to or less than the unit cost used in establishing the budget, then no additional reduction in rates is necessary.  In establishing rates through the normal process, if the unit cost is greater than the unit cost used in establishing the budget, then rates shall be reduced by an amount required to achieve this reduction, but shall not be reduced below the unit cost used to establish the budget.

"Unit cost" was not defined by statute or the GAA. Additionally, no insight was provided regarding reference to establishing rates through the "normal process."

Existing Rule 59G-6.030 did not set out the methodology the Agency used to calculate either the initial 2011 unit cost base or the subsequent years' unit cost(s). However, the Agency has continued to apply the unit cost cap with reference to a 2011 unit cost base of $141.51. In calculating the unit cost base, the Agency used an unadopted fraction methodology in which the numerator, the total Medicaid outpatient payments to all hospitals, is divided by a denominator, the number of Medicaid occasions of service for all hospitals.

After 2011, the Agency has compared the 2011 unit cost base to each years unit cost. However, the Agency changed the fraction methodology originally used to calculate unit cost base. As instructed in the GAA, the Agency began dividing the same numerator, the total dollar amount of Medicaid payments made to all hospitals, by a different denominator, now the number of Medicaid occasions of service for all hospitals, *except in children's and rural hospitals*. Invariably, this method results in a unit cost that is higher than if the services of all hospitals were included.

In setting the individual hospitals' reimbursement rates, the Agency first applied cut 7 in the same manner as cuts 1-4. The result was a 16.5% rate adjustment for cut 7, which was substantially higher than previous cuts, which were usually in the

12% range.  To make the adjustment more consistent with the Legislature's expectations, the Agency adjusted the method for calculating the reduction. The rate setting methodology used for cuts 1-4 applied occasions of service based on a hospital's current cost report. Regarding cuts 7-8, the Agency applied Medicaid budgeted occasions of service.  Medicaid occasions of service are actual paid claims which match up with the cost reporting year; Medicaid budgeted occasions of service are claims which were budgeted for that upcoming fiscal year for which the cut was going to take place.

In 2014, the Legislature directed the Agency to transition from a fee-for-service model to a managed care model.  Under the fee-for-service model, Medicaid payments are made directly by the Agency to hospitals; while under the managed care model, the payments are made by third-party Medicaid managed care plans pursuant to rates negotiated and set forth in third-party contracts between Medicaid managed care plans and hospitals.  The number of Medicaid recipients enrolled in managed care plans now far exceeds those being paid on a fee-for-service basis. With the decline of the number of fee-for-service claims, the rate reductions substantially increased as the cuts were being apportioned over a much smaller number of claims.[4]

Although cut 8 was the last rate cut mandated by the Legislature, the Agency continued to apply the previous and recurring cuts in subsequent years. Three years after cut 8 was

_____

[4] In applying cut 1 in 2015/2016, the Agency divided $16,796,807 (GAA reduction mandate) by 6,385,424 claims, resulting in an average cut per claim of $2.63. The following year, with the transition to Medicaid managed care, that same cut 1 of $16,796,807 was divided by only 3,336,762 claims, resulting in an average cut per claim of $5.03. The same analysis is true for cuts 2-4.  Regarding cuts 7-8, the Agency changed its methodology. Thus, the Hospitals provided outpatient services to essentially the same number of Medicaid recipients for rate periods 2015/16 and 2016/17 (but a significantly greater percentage were through managed care), yet there was a 91% increase in the average reduction per claim associated with each of cuts 1-4.

enacted, the Agency changed its method to apply cut 7 and 8 reductions. Rather than using budgeted claims as it did previously, the Agency calculated the cut 7 and 8 reductions using actual occasions of service as it did for cuts 1-4.

While the transition to managed care began in 2014, the decrease in fee-for-service claims was first reflected in the data used to set the 2016/2017 hospital outpatient rates, effective July 1, 2016. Approximately 75% to 80% of Florida Medicaid claims are now paid under Medicaid managed care.

Before the 2016 legislative session, a legislative proposal recommended determining prospective Medicaid outpatient reimbursement rates using a completely new method called Enhanced Ambulatory Patient Groups ("EAPGs"). This new method would eliminate dependence on hospital cost reports and complicated calculations to determine the effects of the MTA reductions on reimbursement rates. When it became apparent that the EAPGs method would not be used for the 2016/2017 fiscal year, the Agency basically repeated the 2015/2016 process but adjusted the occasions of service used for calculating the hospital's rate reductions for cuts 7-8 by adding 14,000 occasions of service.[5] At the end of July, the Agency published new rates effective July 1, 2016. The language of the implementing statutes and GAAs remained unchanged.

The Hospitals filed actions challenging the Agency's MTA methodologies as invalid exercises of delegated legislative authority. In response, the Agency published a proposed Rule 59G-6.030. Thereafter, the Hospitals filed a subsequent Petition challenging both the existing and proposed rules.

In the Final Order, the ALJ found that neither the existing nor proposed Rule 59G-6.030 exceeds the grant of legislative authority; specifically, the ALJ concluded neither the existing nor the proposed rules regarding MTAs enlarge, modify or contravene the specific provisions of law implemented; are not arbitrary or

_____

[5] The Final Order contains no factual findings as to how this number was calculated by the Agency.

capricious; are not vague; and do not vest unbridled discretion in the Agency. The ALJ held similarly with regard to the unit cost cap. The Final Order further concluded that despite this legislatively mandated change in Medicaid reimbursement and corresponding budget changes, the Agency never changed its methodology to account for the transition to managed care in the calculation of cuts 1-4.

The Hospitals appeal asserting the ALJ erred in declaring both the existing and proposed rules as valid exercises of delegated legislative authority and that implementing the MTA and unit cost cap methodologies does not constitute an invalid unadopted rule under section 120.52(8)(a), (c)-(e), Florida Statutes. The Hospitals argue that while the Agency has implemented a variety of different methodologies to apply the MTA reductions since 2005, it did not engage in rulemaking to adopt the methodologies into the Outpatient Plan. The Hospitals deny the unveiling of the proposed rule resolved the deficiencies because it still fails to provide an MTA recurring methodology as required by implementing law.

*II. Analysis*

*Standard of Review*

The standard of review by which we determine whether an agency has exceeded its rulemaking authority or enlarged the specific provisions of law purportedly implemented is *de novo. See, e.g., State Bd. of Trs. of Internal Improvement Tr. Fund v. Day Cruise Ass'n, Inc.,* 794 So. 2d 696, 701 (Fla. 1st DCA 2001). An ALJ's factual findings are reviewed for competent, substantial evidence. *Moreland v. Agency for Persons with Disabilities*, 19 So. 3d 1009, 1011 (Fla. 1st DCA 2009) (citing § 120.68(7), Fla. Stat.). If challenging an existing rule, the petitioner has the burden of proving by a preponderance of the evidence that the existing rule is an invalid exercise of delegated legislative authority. § 120.56(3)(a), Fla. Stat. If challenging a proposed rule, the burden shifts to the agency to prove by a preponderance of the evidence that the proposed rule is not an invalid exercise of delegated legislative authority. § 120.56(2)(a), Fla. Stat.; *Fla. Bd. of Med. v. Fla. Acad. of Cosmetic Surgery*, 808 So. 2d 243, 251 (Fla. 1st DCA 2002).

*The Statutes and GAAs*

The Agency makes payment to qualified providers as set forth in Chapter 409, Florida Statutes, subject to the limitations or directions enumerated in the GAAs. § 409.902(1), Fla. Stat. Section 409.908, Florida Statutes, provides:

> Subject to specific appropriations, *the agency shall reimburse Medicaid providers*, in accordance with state and federal law, *according to methodologies set forth in the rules of the Agency and in policy manuals and handbooks incorporated by reference therein.* These methodologies may include fee schedules, reimbursement methods based on cost reporting, negotiated fees, competitive bidding pursuant to s. 287.057, and other mechanisms the agency considers efficient and effective for purchasing services or goods on behalf of recipients. . . . Further, nothing in this section shall be construed to prevent or limit the agency from adjusting fees, reimbursement rates, lengths of stay, number of visits, or number of services, or making any other adjustments necessary to comply with the availability of moneys and any limitations or directions provided for in the General Appropriations Act, provided the adjustment is consistent with legislative intent. (Emphasis added.)

Section 409.905, Florida Statutes, also gives the Agency the authority to make any adjustments necessary to comply with the funds allocated and which are consistent with directions set forth in the GAA. Specific to outpatient services, the statute directs, "[t]he agency *shall implement a prospective payment methodology* for establishing reimbursement rates for outpatient hospital services." § 409.905(6)(b), Fla. Stat. (emphasis added).

The various GAAs further instruct, "the Agency *shall implement a recurring methodology* in the Title XIX Outpatient Hospital Reimbursement Plan that may include, but not limited to, the inflation factor, variable cost savings." (Emphasis added.)

A.  *Both the Existing and Proposed Rules Relating to the MTAs Enlarge, Modify, or Contravene the Enabling Statutes.*

An agency may not propose or create a rule that "enlarges, modifies, or contravenes the specific provisions of . . . the language of the enabling statute." §§ 120.52(8)(c), (9), 120.56(2)-(3), Fla. Stat. Existing Rule 59G-6.030 provides, "[r]eimbursement to participating hospitals for services provided shall be in accordance with the Florida Title XIX Outpatient Hospital Reimbursement Plan (the Plan), Version XXVII, effective July 1, 2016, incorporated by reference . . ." The companion Outpatient Plan provides, "Effective July 1, 2005, a recurring rate reduction *shall be established . . .*" (Emphasis added.) The Outpatient Plan does not describe the methods established.

Upon the filing of the petition challenging existing Rule 59G-6.030, the Agency published a proposed rule. It addressed how the Agency had set the 2016 rates but did not establish a recurring methodology. The proposed rule did not adopt the methodologies that the Agency applied to calculate cuts 7-8 when it set the 2011 through 2015 outpatient rates. Nor did the proposed rule set forth a methodology for cuts 1-4. Rather, the stated purpose of the proposed rule was merely to "clarify" how the Agency had already set the 2016 rates. Therefore, the proposed rule, like the existing rule, provided no detail or announcement of a recurring MTA methodology.

Below, the ALJ determined that the implementing statutes require the Agency to adopt its rate-setting methodologies as a rule in the Outpatient Plan. And specific to the MTA, the ALJ further found the GAAs require that the Agency adopt a "recurring" MTA methodology to achieve the mandated savings. The Final Order, however, concluded the Agency had not adopted any recurring MTA methodologies into any version of the existing rule and Outpatient Plan. The Final Order found that "[t]he versions of the rule 59G-6.030 adopted up to and including the existing rule did little more than restate language in the statutes and the GAAs." The Final Order made specific findings that the Agency applied a variety of MTA methodologies to reduce hospital outpatient rates in an attempt to achieve the savings mandated by the GAAs from 2005 through 2016, and that these methodologies were not set forth in a rule. Further, the Final Order found the proposed rule simply parroted the language in the GAA—that the Agency was required to adopt a recurring methodology to achieve the

33

mandated savings. However, no such recurring methodology is provided.

Despite its finding that the Agency had not implemented methodologies as directed, the ALJ ultimately concluded that neither the existing nor proposed rules enlarged, modified or contravened the specific provisions of law implemented. This conclusion rested entirely upon deference to the Agency's interpretation of the implementing statutes. But, the ALJ's deference to Agency interpretation was in error. Based on the clear and unambiguous language of the statute, the Agency was required to adopt a rule setting forth the methodology by which it would reimburse Medicaid providers and apply the MTAs. *See* § 409.908, Fla. Stat. Prior to passage of the newly enacted article V, section 21 of the Florida Constitution, this Court deferred to an agency's interpretation of statutes it implemented unless such interpretation was clearly erroneous. *See, e*.*g*., *Falk v. Beard*, 614 So. 2d 1086, 1089 (Fla. 1993); *Addison v. Agency for Persons with Disabilities*, 113 So. 3d 1053, 1056 (Fla. 1st DCA 2013). Notably, this deference does not extend to proposed rules which are not to be presumed valid or invalid. *See* § 120.56(2)(c), Fla. Stat.

Under the new constitutional amendment, appellate courts no longer defer to agency interpretation; rather, a *de novo* standard of review applies. Art. V, § 21, Fla. Const. (2019). Here, we decline to address the question of whether this amendment is retroactively applied, as it is not necessary to our legal analysis, because even if deference were provided to the Agency's interpretation of the statute, "judicial adherence to the Agency's view is not demanded when it is contrary to the statute's plain meaning," as is the case here. *PAC for Equality v. Dep't of State, Fla. Elections Comm'n*, 542 So. 2d 459, 460 (Fla. 2d DCA 1989), *quoted in Werner v. Dep't of Ins. & Treasurer*, 689 So. 2d 1211, 1214 (Fla. 1st DCA 1997); *see also Kessler v. Dep't of Mgmt. Servs., Div. of State Grp. Ins.*, 17 So. 3d 759, 762 (Fla. 1st DCA 2009) ("Judicial deference never requires that courts adopt an agency's interpretation of a statute or rule when the agency's interpretation cannot be reconciled with the plain language of the statute. . .").

The language of the implementing statutes and the GAAs is clear and unambiguous. As the Final Order found, the GAAs

unambiguously state that the Agency must "implement a recurring methodology in the [Outpatient Plan] . . . to achieve the cost savings." Similarly, section 409.905(6)(b) requires the Agency to "implement a methodology" for establishing rates, and section 409.908 requires the Agency to reimburse Medicaid providers "according to methodologies set forth in the rules of the agency and in policy manuals and handbooks incorporated by reference hereto." Existing Rule 59G-6.030 does little more than restate language in the statute and GAAs. A plain reading of section 409.908 certainly contemplates more. Thus, the existing rule is improper as it fails to adopt a methodology "set forth in the rules of the agency" in contravention of the statutes implemented.

Regarding the proposed rule, the Agency merely supplemented the existing rule with an announcement of the 2016 rates. The proposed rule does not adopt the methodologies that the Agency applied to calculate cuts 7-8 for the purpose of setting the 2011 through 2015 rates. The proposed rule certainly did not provide explanation as to the different methodology used for cuts 1-4. The proposed rule states, "Additions and changes to this section from the preceding year(s) are intended to clarify the rate-setting process, not to make substantive changes to it." In fact, the Agency did not even adopt the methodology that it actually used to set the 2016 rates. In calculating cuts 7-8 for the 2016 rates, the Agency utilized the actual occasions of service to calculate the 2015 rates with the addition of 14,000 claims, while the proposed rule directs calculation based on the budgeted occasions of service used to set the 2015/2016 rates but without the addition of 14,000 claims to account for managed care transition.

At the merits hearing, the Agency argued that it had complied with the implementing statutes and GAAs as it adopted a methodology in setting the rates—that reimbursement rate reductions were to be proportionally implemented among the hospitals. Accordingly, the specific math for achieving that proportional reduction did not have to be fixed, recurring, or adopted into a rule. However, on appeal, the Agency changes its position and argues it exercised its discretion and chose not to adopt a methodology, and no methodology existed to be adopted by rule. The Agency asserts that each year it carried out the MTA reductions using "simple math," and because the use of math is not

a "methodology" contemplated by section 409.908, it did not need to promulgate its use of math as a rule. The Agency claims section 409.908, which applies to adjustments such as the MTA, grants the Agency the authority and flexibility to make adjustments to reimbursement rates that may be necessary when the Legislature chooses to impose limitations on reimbursements, without promulgating its mathematical calculations for such adjustments in a rule. The Agency claims its conclusion is bolstered by the language in the GAAs, which simply required it to "implement" (not adopt) a process for reaching the specified MTA reductions each year that were to be applied. However, this argument ignores the GAA directive that the recurring methodology be described in the Outpatient Plan.

The Agency does not suggest that the implementing statutes exempt it from the rulemaking requirement of the APA. Even if the Agency practices were "just math," there is nothing in the statutes that establishes "math" as an exception to the Legislative directive that all reimbursement methodologies must be contained in the Outpatient Plan and promulgated as a rule. The APA defines a "rule" as "each agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the procedure or practice requirements of an agency . . . ." § 120.52(16), Fla. Stat. The Final Order made numerous findings that the Agency's MTA methodology meets the definition of a "rule." As the Agency has not cross-appealed these findings, it is bound by them, and as such, the Agency's MTA methodology is a rule that the Agency must adopt through rulemaking. It is well established Florida law that rulemaking is not a matter of agency discretion. § 120.54(1), Fla. Stat. Florida courts have long recognized that "every agency action is 'a recognizable rule or an order' under the APA or is 'incipiently a rule or order.'" *Friends of Hatchineha, Inc. v. State, Dep't of Envtl. Regulation*, 580 So. 2d 267, 271 (Fla. 1st DCA 1991); *see also* § 120.52(2), Fla. Stat.

The Final Order is silent regarding whether the Agency's unadopted methodologies achieved the mandated savings. Thus, despite a clear legislative directive to achieve a specific dollar amount of savings, the Agency did not prove at the hearing whether its methodologies have achieved the legislative mandates or resulted in cuts less than or in excess of the cuts authorized. The

Agency defends that the absence of auditing is irrelevant to the outcome of this proceeding because the "math" the Agency used was "correct," and the statutes do not impose an auditing requirement. We disagree. As the Agency never implemented its methodology by rule or in the Outpatient Plan, and never conducted an audit, the accuracy of the MTA reductions cannot be verified. The Agency's failure to verify its procedures were achieving the legislatively directed cuts and to promulgate its methodologies as rules constitutes an enlargement, modification, and contravention of the laws implemented.

We, therefore, find that both the existing and proposed rules are invalid under section 120.52(8)(c), Florida Statutes.

B. *Both the Existing and Proposed Rules Relating to the MTAs are Vague, Fail to Establish Adequate Standards for Agency Decision, and Vest Unbridled Discretion in the Agency.*

A rule is an invalid exercise of delegated legislative authority when "[t]he rule is vague, fails to establish adequate standards for agency decisions, or vests unbridled discretion in the Agency[.]" § 120.52(8)(d), Fla. Stat. "An administrative rule is invalid under section 120.52(8)(d), Florida Statutes, if it forbids or requires the performance of an act in terms that are so vague that persons of common intelligence must guess at its meaning and differ as to its application." *State, Dep't of Fin. Servs. v. Peter R. Brown Const., Inc.*, 108 So. 3d 723, 728 (Fla. 1st DCA 2013) (citing *Bouters v. State*, 659 So. 2d 235, 238 (Fla. 1995)).

Under the existing rule, the Agency used occasions of service to achieve cuts 1-4, while it used budgeted claims of service for cuts 7-8. Yet, the language related to cuts 1-4 and 7-8 are nearly identical. Thus, under the rule that states, "[Agency] shall implement a recurring methodology," the Agency was able to implement two separate methodologies, without change to the rule. Essentially, by applying the rule as it has, the Agency has determined the language in the existing rule is so vague "persons of common intelligence" could "differ as to its application." *Id*.

Despite amendment, the proposed rule fails to establish adequate standards and vests unbridled discretion in the Agency.

37

Although the proposed rule indicates cuts 1-4 will utilize occasions of service, while cuts 7-8 will utilize budgeted occasions of service, questions remain as to whether these are the set methodologies which must be used by the Agency in administering the MTAs. In the first section of the proposed rule, it states "[the Agency] shall implement a methodology for establishing base reimbursement rates" without setting forth the actual methodology and certainly not a "recurring" methodology. Additionally, the lack of verification via audit or otherwise to determine if the rate reductions are GAA compliant further supports a vesting of unbridled discretion in the Agency. Thus, the proposed rule fails, just as the existing rule does.

C. *Both the Existing and Proposed Rules Concerning the Unit Cost Cap are Invalid Exercises of Delegated Legislative Authority and are Unadopted Rules.*

In 2011, the Legislature directed that a unit cost comparison be implemented in the rate process. The GAA provided:

> In establishing rates through the normal process, prior to including this reduction [cut 7], if the unit cost is equal to or less than the unit cost used in establishing the budget, then no additional reduction in rates is necessary. In establishing rates through the normal process, if the unit cost is greater than the unit cost used in establishing the budget, then rates shall be reduced by an amount required to achieve this reduction, but shall not be reduced below the unit cost used in establishing the budget.

The Agency failed to include in its existing rule the methodology used to calculate the unit cost cap. Rather, the existing rule simply mirrors the language in the GAA, stating, "Effective July 1, 2011, [the Agency] shall establish rates at a level that ensures no increase in statewide expenditures resulting from a change in unit costs." The existing rule does not define "unit cost" or set out the methodology used to calculate either the initial 2011 unit cost base or the subsequent years' unit cost(s).

When originally calculating the unit cost cap in 2011, the Agency divided the total dollar amount of Medicaid payments

made to hospitals by the number of Medicaid occasions of service for all hospitals.  Since 2011, it has compared the 2011 unit cost base to the current unit cost, calculated by dividing the total dollar amount of Medicaid payments made to all hospitals by the number of Medicaid occasions of service for all hospitals, except in children's and rural hospitals, to determine whether the unit cost cap would require a further rate reduction, after applying the MTA cuts.

The GAA instructed the Agency to compare the unit cost set in 2011 to the unit cost in future years.  We find merit in the Hospitals' argument that the Agency's comparison of unit costs that are not calculated the same way constitutes unbridled discretion.[6]  Dividing the total amount of Medicaid payments by a smaller number of occasions of service inevitably results in the subsequent years' unit cost being higher, which could result in additional reductions (where it would not if the unit cost was calculated consistent with that methodology used in 2011).  If the unit cost is not calculated the same way, a valid comparison is not possible.[7]

While the Agency has not adopted as a rule the methodology for the unit cost cap into the Outpatient Plan, it has implemented a methodology to calculate rates. This methodology constitutes general applicability that implements, interprets, or prescribes law or policy, and meets the definition of a rule, yet the Agency did not adopt the methodology as a rule. As such, the unit cost cap is invalid as it was not adopted through rulemaking. § 120.52(8)(a), Fla. Stat.

### III. Conclusion

---

[6] The Agency argues that the Hospitals do not have standing to challenge the unit cost cap calculation.  However, as found by the ALJ, the Hospitals have standing as they are substantially affected by the rule. *See* § 120.56(1), Fla. Stat.

[7] To date, the unit cost cap has not been exceeded. However, the Hospitals argue this is an inevitable result due to the migration to managed care.

For the foregoing reasons, we hold that the ALJ erred in concluding the existing and proposed Rule 59G-6.030 are valid exercises of delegated legislative authority. The existing and proposed rules go beyond the powers, functions, and duties delegated by the Legislature, and the methodologies utilized by the Agency are unadopted rules.

REVERSED.

BILBREY and WINOKUR, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Stephen A. Ecenia, David M. Maloney, Tana D. Storey, and Gabriel F.V. Warren of Rutledge Ecenia, Tallahassee; Kyle L. Kemper and Steven Mindlin of Sundstrom & Mindlin, LLP, Tallahassee; Joanne B. Erde and Donna Holshouser Stinson of Duane Morris LLP, Miami; Michael J. Glazer and E. Dylan Rivers of Ausley McMullen, Tallahassee; and Christopher C. Kokoruda and Laura E. Wade of the Miami-Dade County Attorney's Office, Miami, for Appellants.

Joseph Goldstein of Shutts & Bowen LLP, Fort Lauderdale; Amber Stoner of Shutts & Bowen LLP, Tallahassee; and Stephen T. Maher of Shutts & Bowen LLP, Miami, for Appellee.